**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Gina MESA, Defendant–Appellant.**

No. 94–6367.

United States Court of Appeals,
Sixth Circuit.

Argued July 31, 1995.

Decided Aug. 10, 1995.

Robert Anderson, Asst. U.S. Atty. (briefed), Lawrence W. Moon, Jr., Asst. U.S. Atty. (argued), Office of U.S. Atty., Nashville, TN, for U.S.

Henry A. Martin, Fed. Public Defender (briefed), Sumter L. Camp, Asst. Fed. Public Defender (argued), Federal Public Defender's Office, Nashville, TN, for Gina Mesa.

Before: MARTIN, GUY, and DAUGHTREY, Circuit Judges.

RALPH B. GUY, Jr., Circuit Judge.

After her motion to suppress was denied, the defendant entered a conditional plea of guilty to one count of conspiracy to distribute cocaine. Having reserved the right to appeal, defendant now argues that it was error to deny her motion to suppress. Mesa further contends that a sentencing enhancement imposed for possession of a firearm was improper.

Our review of the record convinces us that defendant's motion to suppress should have been granted. This decision makes it unnecessary to consider the sentencing issue and other sub-issues raised in connection with the motion to suppress.

## I.

On April 19, 1994, the defendant, Gina Mesa, was stopped for speeding by Selby County, Tennessee, Sheriff's Officer, Jeffrey Segerson. Mesa was driving a 1986 Cadillac eastbound on Interstate 40 at the time she was stopped. In the car with her were her sister, Estella, and Estella's two children. Officer Segerson's police car was equipped with a video camera, which recorded the stop and the subsequent conversations between Segerson and the Mesas.

After Mesa pulled over to the side of the road, Segerson approached her car and asked for her driver's license. Since her driver's license was in the trunk of the car, she had to get out of the car to retrieve it. At this point in time, rather than allowing her to return to her vehicle, Officer Segerson directed the defendant to sit in the back seat of the police vehicle.

Once in the car, defendant was informed by Officer Segerson that she had been speeding and that he was going to issue a traffic warning citation rather than a violation notice. Segerson then proceeded to ask Mesa a number of questions regarding her age, license, and destination. Mesa told Segerson that they were going to Nashville, off Harding Place, to visit her grandfather, who was not feeling well and had had a stroke. Although Mesa's driver's license had been in the trunk of the Cadillac, Segerson learned from defendant that the car belonged to her sister and the registration was still in the car. Segerson exited his police vehicle and approached Estella Mesa in the Cadillac and asked her to produce the car registration, which she did. Segerson then asked her about their destination, and she told him they

were visiting their grandfather in Nashville. When Segerson asked if anything was wrong with him, Estella replied, "He's just old." Segerson then asked: "He didn't have a heart attack or anything, did he?" Estella said that he did not. At this point in time the officer returned to the police vehicle, and again asked the defendant what was wrong with her grandfather. Gina Mesa replied, "He's not feeling good."

Segerson then proceeded to finish writing the warning citation and asked the defendant to sign it, which was standard procedure. When the signed citation was returned to the officer, however, he did not allow the defendant to leave the police vehicle. Since the door to the back seat of the police vehicle could not be opened from the inside, she could not voluntarily leave without assistance from the officer.

Segerson then proceeded to ask Mesa additional questions, totally unrelated to the initial traffic stop. For example, he asked Mesa whether she had any pistols or drugs in the car. Mesa replied in the negative. The officer then asked "you care if I go over and take a quick look around?" The defendant consented. The officer, however, did not start his "look around" at that time but, rather, filled out a written consent to search form, which he handed to the defendant, saying, "It basically says that you're saying it's okay if we go take a look." The officer also indicated "it's gonna take me just a minute," and that the search would be "a quick little look-see and then let y'all go." Segerson further added, "I don't want to have to get the little kids out." The officer did not in any way explain the form to the defendant prior to her returning the signed form to him. It is clear that defendant never read the form.

Segerson had a trained narcotics detecting dog with him. He approached the Cadillac with the dog and walked the dog around the car. The dog did not alert. By this point in time, there were two other officers on the scene in addition to Segerson, although the record does not reflect whether Segerson called for back up or whether the officers stopped on their own accord.

The three officers began a search of the interior of the car, the underbody of the car, and the trunk. No contraband was found. At this point, Segerson ordered Estella Mesa and her children to join the defendant in the back seat of the police car. The officers then proceeded to remove all of the luggage from the trunk of the car, and Segerson noticed what appeared to be a "partition" in the trunk of the car. Segerson looked behind the partition with a flashlight and saw nothing. Approximately at this point in time, the Mesas indicated that they wished to leave, but they were not allowed to do so.

The three officers eventually pried open the partition. A package wrapped in duct tape became visible. The package contained five kilograms of cocaine, and along with the package were two loaded firearms. Both women were arrested, and Gina Mesa ultimately confessed and agreed to cooperate with the police. As part of this cooperation, she made a telephone call to Daniel Estrella, which conversation was recorded, and during which conversation arrangements were made for the delivery of the cocaine. Estrella subsequently was arrested and pleaded guilty to conspiracy to distribute cocaine. After indictment, the defendant filed a motion to suppress the evidence that was seized from the trunk of the car, essentially claiming that the officers did not have reasonable suspicion sufficient to detain her in the manner in which they did, and, further, that they did not have probable cause for the search of the vehicle. As part of her motion to suppress, defendant further contended that the consent to search was involuntary or, even if voluntary, that it was tainted by the preceding illegal detention. Defendant also argued in her motion to suppress that the scope of the search exceeded the permission granted. The court, after hearing testimony and viewing the videotape, denied the motion.

## II.

Although there is no claim in this case that the initial stop by the officer was pretextual, nonetheless, our analysis begins with the law in this circuit as it relates to highway traffic stops. In *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993), (*en banc*), *cert. de-*

*nied,* —— U.S. ——, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994), we gave the green light to police officers to stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop. This circuit's law in this area gives police agencies as much or arguably more authority than that of any other circuit. In its practical context, at any time of the day or night on any interstate highway within the Sixth Circuit, police officers probably could stop 50 percent or more of the vehicles on the highway for exceeding the speed limit.[1]

The rationale behind our decision in *Ferguson* was not to authorize "fishing expeditions," no matter how well-intentioned, by police agencies. Rather, it was premised on the proposition that the judicial branch of government should not dictate to the executive branch the manner in which it carries out its enforcement function as to the laws passed by the legislature. *See id.* at 392. Since we have extended this authority to the broadest extent possible, however, we have a duty to see that the authority is not abused. Under the circumstances presented here, we feel that the authority was abused. As we will spell out in more detail, if this search can pass muster, then police authorities have a license to search almost every vehicle that they have reason to stop on the highway, with or without the consent of its owner or occupant.

■ Once the purposes of the initial traffic stop were completed, there is no doubt that the officer could not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention.

The government argues that reasonable suspicion did arise from the following: (1)

the defendant told Officer Segerson that their grandfather lived in Kingsport, Tennessee, and her sister told Officer Segerson that their grandfather lived in Nashville, Tennessee; (2) defendant said that her grandfather had had a stroke, and her sister, in response to a question as to whether her grandfather had suffered a heart attack, replied in the negative; and (3) the defendant appeared nervous.

We need spend little time on reasons (1) and (2). Defendant denies telling the police officer that her grandfather lived in Kingsport, Tennessee, and claims, as did her sister, that she told the officer that her grandfather's home was in Nashville, and specifically mentioned that it was "off Harding Place." The videotape and the companion sound recording, which we have reviewed, supports defendant's version. Any finding by the trial court to the contrary is clearly erroneous.[2]

■ The claimed discrepancy that exists between the defendant saying her grandfather had a stroke and her sister's replying in the negative to a question as to whether he had had a heart attack, is simply not a discrepancy sufficient to generate suspicion in the mind of a reasonable police officer. A hunch is not reasonable suspicion.

■ Thus, we are left with only the alleged nervousness of the defendant and her sister as the basis for the officer having reasonable suspicion for further detention of the defendant and her vehicle. Although there are a plethora of cases referring to a defendant appearing nervous,[3] nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself. *United States v. Hernandez–Alvarado,* 891 F.2d 1414, 1418–19 (9th Cir.1989) (defendant's alleged nervousness is insufficient to create reasonable suspicion); *United States v.*

1. Although this is not part of the record, one only needs to have driven any of the interstate highways within the Sixth Circuit to know that the 65 mile-an-hour speed limit is, barring bad weather or unusual conditions, honored for the most part in the breach.

2. The government argues that due to traffic noise the sound recording did not pick up all of the

conversations that occurred between Officer Segerson and defendant. Although this is true, it did pick up the conversation relating to the defendant's destination in Nashville.

3. Most of these cases arise in the context of airport searches.

*White,* 890 F.2d 1413, 1418 (8th Cir.1989), *cert. denied,* 498 U.S. 825, 111 S.Ct. 77, 112 L.Ed.2d 50 (1990) (an airline passenger who was stopped because he fit the drug courier profile and appeared nervous after the stop did not provide officers with reasonable suspicion); *United States v. Saperstein,* 723 F.2d 1221, 1228 (6th Cir.1983) (nervousness is an inherently unsuspicious behavior trait). Although we do not rule out the possibility that under some set of circumstances nervousness alone actually might give an officer sufficient reasonable suspicion to support a further detention, that is certainly not the case under the facts presented here. Defendant, who was not even issued a violation notice, was locked from the beginning of the encounter in the back seat of a police vehicle, and kept there for a considerable period of time. She not only did not feel free to leave during this time, but also was physically unable to leave. Appearing nervous under such circumstances strikes us as being the norm rather than the exception.

Similarly, her sister was left in the Cadillac with the children for a considerable period of time while the defendant was locked in the back seat of the police vehicle. Her sister was not informed as to what was transpiring and would have been understandably nervous at what appeared to be a departure from a routine traffic stop.

Both the government and the defendant cite us to authority claimed to be analogous to the facts here in support of their positions. We find it unnecessary to discuss these cases in detail, although we note in passing that, in general, the cases relied upon by the government are more clearly distinguishable from the facts presented here than are those relied upon by the defendant. This case is simply one in which the officer crossed over the line of permissible conduct subsequent to a legitimate traffic stop, and it is clear enough to us that such is the case here that we need reference no other cases in support of our holding.

4. It is not clear that this decision really has "thwarted" good police work. In the first place, officers who exceed their authority are not doing good police work. Second, regardless of our holding in this case, the government successfully

Although there is always a temptation in cases of this nature when a substantial quantity of drugs and firearms are found to let the end justify the means, it must be remembered that the courts only see cases in which the conduct of the officer resulted in contraband being found. If the officers had found no drugs in the defendant's car, obviously we would not even know that this traffic stop had ever occurred. Therefore, we must accept that courts will always be "thwarting" what some may view as a good piece of police work when a motion to suppress is granted in cases of this nature.[4] Notwithstanding the importance of drug interdiction, however, we are still charged with the responsibility of seeing that the interdiction occurs without the Constitution being violated. Such was not the case here.

The decision to deny the motion to suppress is **REVERSED**, defendant's conviction is **REVERSED**, and this case is **REMANDED** to the district court for any further proceedings necessary.

arrested and convicted the principal drug supplier in this conspiracy, and it is only the currently incarcerated "mule," the defendant, who benefits from this decision.