UNITED STATES of America,

v.

James Kimball OLSON [1] and James Gary Bostwick.

No. 3–99–00056.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 27, 1999.

---

1. *See* motion (filed June 18, 1999; Docket Entry No. 27) to amend indictment and order (Docket Entry No. 35) entered July 1, 1999, amending the indictment to change the defendant's name to "James Kimball Olson."

Richard McGee, Nashville, TN, for John Kimball Olson, defendant.

E.E. (Bo) Edwards, III, Edwards, Simmons & Oliver, Nashville, TN, for James Gary Bostwick, defendant.

## MEMORANDUM

HIGGINS, District Judge.

The Court has before it the defendants' motion (filed May 27, 1999; Docket Entry No. 18) to suppress, their memorandum (Docket Entry No. 19) in support; the government's response (filed June 4, 1999; Docket Entry No. 20); defendant Bostwick's first response (filed June 25, 1999; Docket Entry No. 29) to the government's assertion that he lacks standing and his supplemental response (filed June 28, 1999; Docket Entry No. 32).

A hearing was held on the defendants' motion on June 30–31, 1999. For the reasons stated below, the defendants' motion shall be granted as to Mr. Olson and shall be denied as to Mr. Bostwick.

### I.

On October 21, 1998, the defendants, James Olson and James Bostwick, were traveling eastbound on Interstate 40 through Dickson County, Tennessee. Mr. Olson, the driver and owner of the vehicle, and Mr. Bostwick, the passenger, were traveling from Arizona to Massachusetts. At the same time, State Trooper Jerry Ferrell, a member of the Tennessee Highway Patrol Criminal Interdiction Team, was also traveling eastbound in the vicinity of the defendants.[2]

Trooper Ferrell was traveling in the left lane behind another vehicle and at some distance behind the defendants, who were traveling in the right lane. Trooper Ferrell testified that there were either two or three cars traveling behind the defendants in the right lane, but he was unable to recall the exact number or to estimate the distance between the cars and the defendant. He did estimate that all of the cars were traveling at approximately sixty-five to seventy miles per hour.

Mr. Olson moved his vehicle into the left lane in front of Trooper Ferrell. There was one car between Trooper Ferrell and the defendants. Next, the car between the defendants and Trooper Ferrell moved into the right lane, so that there were no vehicles between Trooper Ferrell and the defendants. Mr. Olson then changed back into the right lane, and in doing so, failed to use his turn signal. Trooper Ferrell testified that Mr. Olson's failure to signal did not cause any hazard to the vehicles traveling behind Mr. Olson in the right lane. He nevertheless thought that Mr. Olson's failure to signal was illegal and pulled the defendants over into the emergency lane on the side of the interstate.

Once in the emergency lane, Trooper Ferrell approached Mr. Olson's window and requested to see his driver's license, registration, and title. Trooper Ferrell testified that while he was talking with Mr. Olson, he noticed that Mr. Bostwick was rapidly puffing on a cigar and he concluded that Mr. Bostwick was nervous. Trooper Ferrell also testified that, at the same time, he detected the smell of green marijuana apart from the smell of the cigar smoke.

Mr. Olson informed Trooper Ferrell that he had just purchased the 1991 Chevrolet Lumina he was driving. He further explained that, although he had the title for the vehicle, the tags were issued for anoth-

---

**2.** Trooper Ferrell has been a patrolman with the Tennessee Highway Patrol for twenty-six years and has been a member of the Criminal Interdiction Team for the last year. He ex-plained at the suppression hearing that the Criminal Interdiction Team patrols the interstate for crimes involving guns, drugs, or stolen vehicles.

er vehicle he owned. The title that Mr. Olson gave Trooper Ferrell was an "open title" which was signed by the seller on October 8, 1998, but did not indicate the purchaser's name. Additionally, Mr. Olson gave Trooper Ferrell the vehicle registration which showed that the vehicle was registered to the seller. Defendants' Exhibit 6. A handwritten note on the registration said "this vehicle sold to [James] K. Olson on 10/19/98." Id.

Upon returning to his patrol car, Trooper Ferrell performed a radio check which confirmed that Mr. Olson's license was valid, that there were no outstanding warrants against him, and that the vehicle he was driving had not been reported stolen. Accordingly, Trooper Ferrell wrote Mr. Olson a warning ticket for improper lane change. He also summoned Trooper Norrod, another member of the Criminal Interdiction Team, who was at a nearby stop and had a trained narcotics detecting dog with him.

Trooper Ferrell returned to Mr. Olson's vehicle and asked him to come to the back of the vehicle where he explained the warning ticket to Mr. Olson. It was around this time that Trooper Norrod arrived. Trooper Ferrell then returned Mr. Olson's license and vehicle papers to him and informed him that he was free to leave.[3] When Mr. Olson turned to leave, however, Trooper Ferrell engaged Mr. Olson in a conversation having nothing to do with his alleged traffic violation.[4] The government admitted at the hearing that, at this point, Trooper Ferrell was detaining Mr. Olson for investigation.

According to Trooper Ferrell, Mr. Olson informed him that while he was Arizona he had purchased the Lumina he was driving and visited his family for several days. Mr. Olson also stated that Mr. Bostwick had flown to Arizona to help with the drive back to Massachusetts. Trooper Ferrell then walked to the passenger side of the car and spoke with Mr. Bostwick while Trooper Norrod talked to Mr. Olson. According to Trooper Ferrell, Mr. Bostwick's account of the defendants' trip to Arizona differed from Mr. Olson's in that Mr. Bostwick stated that he and Mr. Olson went to Arizona, picked up the Lumina, and were returning to Massachusetts. Trooper Ferrell testified that he understood Mr. Bostwick to mean that they had not spent any time in Arizona, but began to return to Massachusetts immediately after purchasing the vehicle. Trooper Ferrell further testified that, in contrast with Mr. Olson's testimony that they had visited his family, Mr. Bostwick stated that they did not visit anyone.

Trooper Ferrell also stated that he smelled marijuana while he was standing at the passenger's side of the vehicle talking to Mr. Bostwick. He further testified he noticed that there was luggage in the back seat of the car. When questioned about the kind or quantity of the luggage at the hearing, Trooper Ferrell was not able to recall any specific details about it.

Trooper Ferrell returned to the rear of the vehicle and asked Mr. Olson if he had any guns or drugs in the car. Mr. Olson replied that he did not. Trooper Ferrell asked whether Mr. Olson would consent to a search of the vehicle. When Mr. Olson refused, Trooper Ferrell informed him that they were going to let Trooper Norrod's narcotics dog walk around the vehicle. When the dog walked around the vehicle, he alerted to the trunk, indicating

**3.** A videotape of part of the stop, including Trooper Ferrell telling Mr. Olson he was free to leave, was recorded from Trooper Norrod's car and shown during the hearing. The videotape was received into evidence and marked as plaintiff's Exhibit 3.

**4.** Their conversation was about Mr. Olson's business and fishing in Massachusetts.

Trooper Ferrell testified that, at this point, he had decided that he was going to detain Mr. Olson's vehicle until Trooper Norrod's narcotics dog was able to walk around the vehicle and check it for drugs. He also testified that if Mr. Olson had walked away, he would have followed him until the vehicle could be checked.

the scent of narcotics. Troopers Norrod and Ferrell opened the trunk and they found approximately two hundred pounds of marijuana. The defendants were arrested and are charged in the Indictment with possession of marijuana with intent to distribute, in violation of Title 21, United States Code, Section 841(a)(1), and aiding and abetting, in violation of Title 18, United States Code, Section 2.

The defendants assert that under the Fourth Amendment to the United States Constitution the marijuana discovered during the search of Mr. Olson's vehicle should be suppressed because probable cause to search the trunk of the vehicle was developed as the result of an unlawful traffic stop and detention. Specifically, the defendants assert that the stop was unreasonable, as Trooper Ferrell did not have probable cause to believe that Mr. Olson had committed a traffic violation by failing to use his turn signal when he changed lanes. The defendants also argue that their detention was unlawful as Trooper Ferrell did not have an articulable suspicion of illegal activity upon which to base the detention of the defendants for investigation once the purpose of the traffic stop was concluded.[5]

## II.

### A. *Stop*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Supreme Court of the United States has found that the stop of an automobile and the temporary detention of individuals during the stop, "even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996) (cita-

tions omitted). The Court explained that an automobile stop constitutes a seizure under the Fourth Amendment because it "significantly curtails the freedom of action of the driver and the passengers, if any, of the detained vehicle." *Berkemer v. McCarty*, 468 U.S. 420, 436, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317, 332 (1984).

In determining whether an automobile stop is constitutional, the Court must conduct a fact specific inquiry which turns upon whether the stop is reasonable under the circumstances. *Id.* Where the police have probable cause to believe that a traffic violation has occurred, the Supreme Court has found that the decision to stop an automobile is reasonable. *See Delaware v. Prouse*, 440 U.S. 648, 659, 99 S.Ct. 1391, 1399, 59 L.Ed.2d 660, 667 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109, 98 S.Ct. 330, 332, 54 L.Ed.2d 331, 336 (1977) (per curiam). The Court of Appeals for the Sixth Circuit in *United States v. Ferguson*, 8 F.3d 385 (6th Cir.1993) (en banc), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994), stated that the police could reasonably stop a vehicle for any traffic violation, no matter how slight and no matter whether the hope of finding contraband as the result of the stop was the officer's subjective motivation for making the stop.

The government contends that Trooper Ferrell had probable cause to stop the defendants because Mr. Olson failed to signal when he changed lanes. The defendants argue that Trooper Ferrell did not have probable cause to stop the defendants because Mr. Olson did not violate any law by changing lanes without using a turn signal.

■ In support of its assertion that Trooper Ferrell had probable cause to stop the defendants, the government relies on Tennessee Code Annotated, Section 55–8–

---

5. The defendants concede that a dog alert on a vehicle provides probable cause to search a vehicle and that if the Court were to find that Trooper Ferrell's stop and detention of the

defendants were lawful, using the marijuana as evidence would not violate their Fourth Amendment right. *See United States v. Diaz*, 25 F.3d 392 (6th Cir.1994).

143, governing signals for turns. That section states, in relevant part:

> (a) Every driver who intends to ... partly turn from a direct line, shall first see that such movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal ... plainly visible to the driver of such other vehicle of the intention to make such movement.

Tenn.Code Ann. § 5–8–143.

The government maintains that a lane change is a partial turn and is governed by this section. The government further contends that any vehicle changing lanes while traveling on an interstate at a rate of sixty-five to seventy miles per hour may affect the other vehicles traveling at a similar speed in the vicinity of that vehicle. Therefore, Mr. Olson's lane change may have affected the vehicles traveling around him and he was required under Section 55–8–143 to signal his lane change.

The defendants argue that Section 55–8–143 does not apply to lane changes, but only to turns in which a vehicle changes direction, such as at an intersection. They point out that Tennessee Code Annotated, Section 55–8–123, titled "Driving on Roadways Laned for Traffic," governs lane changes and does not require that a turn signal be used when changing lanes. That section states, in pertinent part, "(1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." Tenn.Code Ann. § 55–8–123. The defendants argue that if the legislature intended for signals to be required for lane changes, it would have stated so in this section. Additionally, the defendants argue that lane changes are not partial turns under Section 55–8–143, because if they were, Section 55–8–123 would be superfluous.

Trooper Ferrell testified at the suppression hearing that no other vehicles were adversely affected by Mr. Olson's lane change. Moreover, the Court is not persuaded by the government's argument that all vehicles within the vicinity of a vehicle changing lanes on the interstate may be affected by that vehicle's lane change. The Court therefore finds that, even assuming arguendo that Tennessee Code Annotated, Section 55–8–143, governs lane changes, Mr. Olson did not violate that section by failing to use his turn signal. As Mr. Olson did not commit a traffic violation by failing to use his turn signal, Trooper Ferrell did not have probable cause to stop Mr. Olson. Accordingly, the Court finds that the automobile stop and ensuing search of the vehicle violated the defendants' right under the Fourth Amendment to be free of unreasonable searches and seizures.

### B. Detention

The defendants next argue that probable cause for the search also resulted from the unconstitutional detention of the defendants which started once the purpose of the stop was complete. In response, the government contends that the detention of the defendants was constitutional because Trooper Ferrell had a legitimate, articulable reason to begin an investigative stop after the purpose of the traffic stop was complete.

The Fourth Amendment has been interpreted as permitting a law enforcement officer to "briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even if the officer lacks probable cause." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1, 10 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889, 911 (1968).) When the detention is preceded by a traffic stop, after the original purpose for the stop is complete, the officer cannot "further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion

to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995). Whether the officer has such a reasonable, articulable suspicion is determined based upon the "totality of the circumstances." *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir.1998) (citations omitted).

■ Trooper Ferrell agreed during the suppression hearing that the traffic stop was complete once he returned Mr. Olson's papers and gave him the warning ticket. The government conceded at the suppression hearing that Trooper Ferrell instigated an investigative detention at that point by stopping Mr. Olson as he started to walk away and asking him questions unrelated to the stop. Nevertheless, the government argues that the detention did not violate the defendants' Fourth Amendment right to be free from unreasonable seizures because Trooper Ferrell had a reasonable and articulable suspicion that the defendants were engaged in illegal activity.

Trooper Ferrell testified that his suspicion that the defendants were involved in criminal activity was based on the following: (1) that the stories the defendants gave Trooper Ferrell regarding the length of their trip to Arizona and whether the defendants visited Mr. Olson's family were contradictory; (2) that he found it strange that the defendants flew to Arizona to purchase an unremarkable, 1991, Chevrolet Lumina; (3) that the defendants had their luggage in the back seat of the vehicle rather than in the trunk; (4) that he smelled what he thought to be green marijuana and that Mr. Bostwick was rapidly and nervously puffing on his cigar; and (5)

the fact that Mr. Olson had an open title on the vehicle, that the title was dated October 8, 1998, rather than closer to the time of the stop, and that the license plate on the vehicle belonged to another car owned by Mr. Olson.[6]

With respect to the first factor, the defendants' alleged contradictory statements regarding the trip, the defendants argue that Trooper Ferrell did not speak to Mr. Bostwick before he completed the traffic stop. Consequently, the defendants argue that, pursuant to the Sixth Circuit's holding in *Mesa* that something must occur "during the traffic stop" to generate the necessary suspicion, Trooper Ferrell had no reasonable, articulable suspicion based on the statements made by the defendants which would justify their detention at the time the automobile stop was complete. *Mesa*, 62 F.3d at 162.

The defendants also presented Trooper Ferrell's testimony from the October 30, 1998, preliminary hearing in *State of Tennessee v. Olson*, in General Sessions Court for Dickson County, as evidence that the defendants' statements regarding visits with Mr. Olson's family were not contradictory. In the preliminary hearing, Trooper Ferrell testified that Mr. Bostwick told him that the defendants had flown "to Arizona and picked up the car from Mr. Olson's sister and was [sic] headed back." Transcript, defendants' Exhibit 10, at 23. Accordingly, the defendants contend that both defendants told Trooper Ferrell that they visited Mr. Olson's family. In addition, no evidence was presented at the suppression hearing that Mr. Bo-

---

6. The Court notes that during the defendants' preliminary hearings on October 31, 1998, Trooper Ferrell was questioned about why he detained the defendants after the stop was complete. Trooper Ferrell responded that he was suspicious that the vehicle might be stolen. He also mentioned that he found the defendants' stories about the trip to be inconsistent and stated that during the stop, he might have smelled marijuana while talking to Mr. Bostwick. He failed to mention the other reasons he now asserts for his suspi-

cion. Additionally, he testified that he had no reason to believe that Mr. Olson possessed any contraband at the time he wrote the warning ticket. Accordingly, the Court concludes that Trooper Ferrell's story of suspicion has, in large part, been developed between the preliminary hearings on October 31, 1998, and the time of the suppression hearing in June of 1999. The Court will nevertheless discuss the merit of each of these alleged bases for suspicion.

stwick ever stated how long the defendants stayed in Arizona. Instead, Trooper Ferrell merely interpreted Mr. Bostwick's omission with respect to the length of their stay to mean that the defendants left Arizona immediately.

Based on these facts, the Court finds that the government has failed to establish that Trooper Ferrell had a reasonable, articulable suspicion based on the allegedly contradictory statements of the defendants. Moreover, Trooper Ferrell's suspicion must have been established during the traffic stop. *Mesa*, 62 F.3d at 162. The Court finds that the sequence of events indicates that Trooper Ferrell did not know of any inconsistency at the time the traffic stop was complete because he had not yet spoken to Mr. Bostwick. Accordingly, any statements Mr. Bostwick made which contradicted Mr. Olson's statements could not justify the detention of the defendants.

The second factor on which the government relies as a basis for Trooper Ferrell's detention of the defendants was that he found it suspicious that someone would fly from Massachusetts to Arizona for the purpose of purchasing a commonplace vehicle such as a Chevrolet Lumina. However, the record reflects that Mr. Olson had informed Trooper Ferrell that he had also visited family members while in Arizona. Accordingly, the Court finds that this is not a reasonable, articulable basis for Mr. Ferrell's suspicion that the defendants were involved in illegal activity.

The third factor on which the government relies as a basis for Trooper Ferrell's suspicion of the defendants was the luggage Trooper Ferrell noticed on the back seat of the Lumina after questioning Mr. Bostwick. Again, the defendants argue that Trooper Ferrell could not have had a reasonable, articulable suspicion based upon the luggage alleged to be on the back seat of the defendants' vehicle at the time he began the investigative stop because Trooper Ferrell did not see the luggage until after the initial purpose of the stop

was complete and he had spoken to Mr. Bostwick. The defendants further argue that luggage on the back seat of the vehicle does not give rise to a reasonable suspicion to justify their detention. In support of this assertion, the defendants noted that Trooper Ferrell could not describe the luggage or recall whether the luggage occupied the entire back seat.

The Court agrees that Trooper Ferrell testified that he did not see the luggage in the back of the vehicle until the purpose of the traffic stop was complete. Accordingly, he could not have formed a reasonable suspicion based on the luggage during the traffic stop and this basis for the detention must fail. *Mesa*, 62 F.3d at 162. Additionally, the Court finds that traveling with a number of bags in the back seat of a vehicle is not so uncommon as to give rise to a reasonable, articulable suspicion that the defendants were engaged in unlawful conduct.

Next, the government asserts that a reasonable basis for Trooper Ferrell's suspicion was formed when Trooper Ferrell smelled marijuana while standing outside the driver's side of the vehicle when he spoke to Mr. Olson and while standing outside the passenger's side of the vehicle while he spoke to Mr. Bostwick. The government also relies on the allegedly nervous and rapid manner in which Mr. Bostwick smoked his cigar.

Again, the defendants contend that the odor Trooper Ferrell alleges he smelled when he spoke to Mr. Bostwick cannot be the basis for the defendants' detention as his conversation with Mr. Bostwick took place after the initial purpose of the stop was complete.

The defendants also presented Trooper Ferrell's testimony at the defendants' preliminary hearings on October 31, 1998, in General Sessions Court for Dickson County, which casts doubt on his testimony at the suppression hearing that he smelled marijuana while talking to Mr. Olson. At Mr. Olson's preliminary hearing, Trooper

Ferrell was asked if he was asserting that he smelled marijuana during the traffic stop. Trooper Ferrell stated that "[w]hile I was talking to Mr. Bostwick ... I thought I could also might smell a little bit of an odor there and he was using the cigar to disguise the odor. I couldn't say for sure that it was, but it was a little bit of an odor there." Transcript, Defendants' Exhibit 10 at 25. In his testimony, Trooper Ferrell failed to mention that he had smelled marijuana when he spoke to Mr. Olson. He also stated that at the time he wrote Mr. Olson's warning ticket, he had no suspicion that Mr. Olson was in possession of any contraband. Transcript, Defendant's Exhibit 9 at 19. Finally, during Mr. Bostwick's preliminary hearing, Trooper Ferrell was asked if he had any articulable suspicion of criminal activity at the moment he gave Mr. Olson the warning ticket. Trooper Ferrell testified that "[a]t that moment, there was still suspicion in my mind that the vehicle might be stolen." Transcript, government's Exhibit 2 at 15. Again, he did not mention smelling marijuana when he spoke with Mr. Olson.

In considering these contradictions in Trooper Ferrell's testimony, the Court finds that Trooper Ferrell is, at best, uncertain as to when and whether he smelled marijuana during the automobile stop. Accordingly, the Court finds that the alleged smell of marijuana is not a credible basis for a reasonable, articulable suspicion of illegal activity justifying the detention of the defendants.

Trooper Ferrell also alleges that his suspicion was based on the rapid and nervous manner in which Mr. Bostwick was puffing on his cigar. The Sixth Circuit has stated that "we do not rule out the possibility that under some set of circumstances nervousness alone actually might give an officer sufficient reasonable suspicion to support a further detention." Mesa, 62 F.3d at 163. However, the Court noted that "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." Id. at 162 (collecting cases). Accordingly, the Court finds that the nervousness alone, allegedly displayed only by Mr. Bostwick's rapid puffing on his cigar, is not a reasonable articulable basis for suspicion warranting the continued detention of the defendants in this case.

Finally, Trooper Ferrell testified that he was suspicious that the vehicle was stolen because Mr. Olson had an "open title" which was signed by the seller but did not indicate the name of the purchaser, because the title had not been registered, and because the license plate was from another of Mr. Olson's vehicles. Trooper Ferrell also testified that Mr. Olson said he purchased the vehicle two or three days prior to the stop on October 21, 1998, but the title to the vehicle had been signed on October 8, 1998.

The Court finds that this is not a reasonable basis for the officer's suspicion as Trooper Ferrell did a radio check on the vehicle and knew that the vehicle had not been reported stolen.

In summary, the Court finds that Trooper Ferrell had no articulable suspicion upon which to detain the defendants once the purpose of the initial traffic stop was complete. Mesa, 62 F.3d at 162. Accordingly, the ensuing search of Mr. Olson's vehicle violated the defendants' rights to be free of unreasonable searches and seizures. Id.

### C. Exclusion of Evidence

Evidence seized as the result of an unconstitutional search is the fruit of the poisonous tree and cannot be used as proof against the victim of the search. Weeks v. United States, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The government has conceded that if either the automobile stop or the detention of the defendants was unlawful, the marijuana found as a result of the subsequent search is fruit of the poisonous tree and may not be used against Mr. Olson under the exclusionary rule. Accordingly, as the Court has found

that both the initial traffic stop and the detention were unlawful seizures, the contraband discovered as the result of the ensuing search shall be excluded as to Mr. Olson.

However, the government argues that even if the marijuana must be excluded as to Mr. Olson, the evidence found as the result of the search is nevertheless admissible against Mr. Bostwick. In support of its claim that the evidence is admissible against Mr. Bostwick, the government cites *United States v. Carter,* 14 F.3d 1150 (6th Cir.1994).

In *Carter,* the Sixth Circuit found that the search of a vehicle was illegal as to the driver and owner of the vehicle because it was the result of an illegal traffic stop and detention. The passenger in the vehicle argued that he too was the victim of the illegal stop and detention, and therefore, he should benefit from the exclusionary rule with respect to any evidence found during the subsequent search of the vehicle. The Court found that though the passenger could contest the constitutionality of the stop of the vehicle and his detention by the police:

> It does not follow from any of this, however, that the discovery and seizure of the marijuana represented "fruit" of [the passenger's] unlawful detention. Suppose at the time of the driver's arrest the police had summoned a taxi cab for [the passenger] and told him he was free to leave. The marijuana would still have been discovered, because it was located in a van owned and controlled by [the driver] (who was not going anywhere until the vehicle had been searched) and not in a vehicle controlled by [the passenger].

*Id.* at 1154. The government argues that the same is true for Mr. Bostwick.

 Based on the Sixth Circuit's holding in *Carter,* the Court finds that, as a passenger, the discovery and seizure of marijuana in Mr. Olson's car was not the result of Mr. Bostwick's presence during the traffic stop or his detention. There-

fore, the discovery of the marijuana was not the fruit of the stop or the detention of Mr. Bostwick. Accordingly, he was not the victim of the search of Mr. Olson's vehicle and the evidence obtained during that search of shall not be excluded as to Mr. Bostwick.

### III.

In summary, the Court finds that Mr. Olson's failure to signal his lane change did not constitute probable cause for an automobile stop. Nor did Trooper Ferrell have a reasonable, articulable suspicion that the defendants were engaged in unlawful conduct justifying their detention once the purpose of the traffic stop was complete. Therefore, the stop and detention of the defendants violated their right under the Fourth Amendment to be free from unreasonable seizures. Additionally, the Court finds that the marijuana seized during the subsequent search of the vehicle was the fruit of the unconstitutional stop and detention of Mr. Olson, but not of Mr. Bostwick. Therefore, the evidence obtained during the search shall be excluded as to Mr. Olson but shall be admissible against Mr. Bostwick. Accordingly, the Court shall grant the defendants' motion (Docket Entry No. 18) to suppress with respect to Mr. Olson and shall deny the defendants' motion with respect to Mr. Bostwick.

An appropriate order shall be entered.

### *ORDER*

In accordance with the memorandum contemporaneously entered, the defendants' motion (filed May 27, 1999; Docket Entry No. 18) to suppress is granted as to defendant, James Kimball Olson, and is denied as to defendant, James Gary Bostwick.

It is so ORDERED.