**UNITED STATES of America**

v.

**Joshua Paul ORSOLINI**

No. 2:00–00008.

United States District Court,
M.D. Tennessee,
Northeastern Division.

March 15, 2001.

Jimmie Lynn Ramsaur, Office of the United States Attorney, Nashville, TN, for Plaintiff.

B.F. Jack Lowery, Lebanon, TN, for Defendant.

## MEMORANDUM

HAYNES, District Judge.

The United States filed this criminal action against the defendant, Joshua Paul Orsolini, for illegal drug trafficking arising out of a search of his vehicle by a Tennessee state trooper. Before the Court is Orsolini's motion to suppress (Docket Entry No. 15) to which the government has responded (Docket Entry Nos. 24 and 32). In his motion, Orsolini asserts that under the Fourth Amendment, the marijuana discovered during the search of his vehicle should be suppressed as the fruit of an illegal detention. Also before the Court is the Government's motion to ascertain status of the defendant's motion to suppress. (Docket Entry No. 34).

A hearing was held on Orsolini's motion on September 27, 2000. For the reasons stated below, Orsolini's motion is granted. The Government's motion is denied as moot.

## A. FINDINGS OF FACT

On June 30, 2000, the defendant and a passenger were traveling eastbound on Interstate 40 through Smith County, Tennessee. Orsolini, the driver and owner of the vehicle, and a passenger were traveling to Boston, Massachusetts from California. While in Smith County, Tennessee Highway Patrolman Billy Pierce clocked two vehicles, including Orsolini's vehicle, speeding at 80 and 83 mph. The speed limit on that portion of Interstate 40 is 65 mph. Activating his lights, Trooper Pierce stopped Orsolini's vehicle and requested Orsolini's driver license and vehicle registration. Orsolini presented a photocopy of an interim driver license issued by the state of California in the name of Nicholas Panatelli and a bill of sale.[1]

Trooper Pierce testified that while he was talking with Orsolini, he noticed food wrappers on the floor of the vehicle, and a large amount of clothes thrown on the backseat on top of luggage. Trooper Pierce testified that these items made him suspicious as to why clothes and luggage were on the backseat and not in the trunk. These observations, coupled with the bill of sale from El Paso, Texas[2], prompted Trooper Pierce to radio for back-up when he returned to his patrol car. During this time, Trooper Pierce testified that he felt that there was "possible criminal activity" and requested assistance because officers "may want to look at this."

Trooper Pierce testified that he attempted to run the driver license number, but the computer was down. Although the citation form would take about five to six minutes to complete, the videotape of the search reveals that Trooper Pierce patted Orsolini and questioned him. The audio portion of the tape does not reflect the nature or substance of this discussion. Trooper Pierce detained Orsolini and his accomplice for about 12 minutes before he began issuing a citation.

After about 10 minutes, Trooper Shannon Brinkley arrived on the scene and after talking to Trooper Pierce for 2 to 3 minutes, Trooper Brinkley began to ques-

---

1. The interim driver's license was later determined to be false, but it is unclear when this fact was known. The fact that Trooper Pierce had released Orsolini to go notwithstanding his lack of verification of the driver's license suggests that it was not a factor related to the speeding offense or Orsolini's detention. The bill of sale reflects that the vehicle was pur- chased for cash on June 26, 2000 from Mission Chevrolet in El Paso, Texas, but the officers did not question the purchase date, only the site of its purchase.

2. Trooper Pierce explained at the suppression hearing that El Paso, Texas is a point of entry for illegal drugs.

tion Orsolini and the passenger. Brinkley sometimes asked leading questions as to the purpose of Orsolini's travel. According to Brinkley, in their responses to Trooper Brinkley's leading questions, Orsolini and the passenger gave conflicting stories as to where and why they were in Texas and going to Boston. This questioning lasted 2 to 3 minutes. After that, Trooper Pierce returned Orsolini's driver license, bill of sale and speeding citation and Trooper Brinkley told Orsolini that he was free to go.

Yet, within seconds [3], Trooper Brinkley, without any further information, immediately asked Orsolini if there were anything illegal in the vehicle and sought consent to search the vehicle. There are gaps on two video tapes of this seizure. During several discussions the troopers deactivated their audio receivers. The defendant asked Trooper Brinkley if he were free to go and Trooper Brinkley told him that he was free to go, but that the vehicle would be held to be checked by a canine.

At this point, Trooper Brinkley testified that Orsolini became visibly nervous. As Trooper Brinkley questioned Orsolini, attempting to receive a consent to search Orsolini's vehicle, Trooper Brinkley told Orsolini that if he did not have anything to hide, he should not have a problem with the troopers searching his vehicle. There was additional questioning of Orsolini and the passenger about their personal history, reasons for traveling and destination by the troopers that lasted about 10 minutes. Eventually, Orsolini consented to the search of his vehicle and completed the paper work for the consent.

Shortly after Orsolini gave his consent, Orsolini verbally withdrew his consent. Again, the troopers told Orsolini and the passenger that they were free to go, but the vehicle had to remain. Trooper Brinkley continued to question Orsolini and the passenger for another 10 minutes or so. Trooper Brinkley insisted that he was not attempting to talk Orsolini into consenting to the search, but repeatedly told Orsolini and the passenger that if they would consent, the search would take about five minutes or they could wait for the canine patrol that would take 20 to 30 minutes. The troopers intended to have a canine dog sniff the vehicle. Orsolini and the passenger stated that they wanted to go to the next exit to use the restroom and get something to drink. The passenger stated that she would walk; Trooper Ferguson, however, arrived on the scene and gave Orsolini and the passenger a ride to the next exit, about twenty-four (24) minutes after Trooper Pierce had issued the speeding citation and thirty-six (36) minutes after the initial stopping of the vehicle.

According to the troopers, while Orsolini and passenger were away from the vehicle, the canine arrived about 18 minutes later and from outside the vehicle indicated a drug presence in the vehicle. The troopers then opened the vehicle to enable the dog to enter. The dog's search of the vehicle took about another 17 minutes. Trooper Pierce then radioed Trooper Ferguson and told him to bring Orsolini and the passenger back to the scene. At the scene, Orsolini relinquished the key to the trunk where marijuana was discovered. Orsolini and the passenger were arrested.

## B. CONCLUSIONS OF LAW

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects,

---

3. The troopers had been advised that a vehicle stop for a speeding violation had to be concluded before a general investigation on separate matters could be pursued. Thus, giving rise to this very brief interlude between the return of the license, the issuance of the citation and the request to search for drugs.

against unreasonable searches and sei-zures." *Whren v. United States*, 517 U.S. 806, 810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95 (1996). In *U.S. v. Avery*, 128 F.3d 974 (6th Cir.1997), the Sixth Circuit ex-plained the various basis for seizures:

> Typically, three levels of encounters be-tween police and citizens are challenged in the courts: (1) the consensual encoun-ter, which may be initiated without an objective level of suspicion, *United States v. Travis*, 62 F.3d 170 (6th Cir. 1995), *cert. denied*, 516 U.S. 1060, 116 S.Ct. 738, 133 L.Ed.2d 688 (1996); (2) the investigative detention, which, if non-consensual, must be supported by a reasonable, articulable suspicion of crim-inal activity, *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Respress*, 9 F.3d 483 (6th Cir.1993); and (3) the arrest, valid only if supported by proba-ble cause, *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). *Investigative detentions and arrests are considered "seizures" and thus must be conducted consistent with the Fourth Amendment principles described above.*

*Id.* at 982. (emphasis added).

Here, given the undisputed speeding by Orsolini, the Court concludes that the ini-tial stopping or seizure of Orsolini was reasonable and was based upon probable cause. The issue here is the reasonable-ness of the post seizure detention of Orso-lini and the search of his vehicle.

As to traffic stops, "[i]t is well estab-lished that a vehicle stop at a highway checkpoint effectuates a seizure within the meaning of the Fourth Amendment." *In-dianapolis v. Edmond*, 531 U.S. 32, 40, 121 S.Ct. 447, 453, 148 L.Ed.2d 333 (2000). Yet, the Supreme Court "has never ap-proved a check point program whose pri-mary purpose was to detect evidence of ordinary criminal wrongdoing." *Id.* at 449. The Supreme Court noted that a traffic

stop is lawful, provided there is probable cause to find that a traffic violation has occurred. *Whren*, 517 U.S. at 810, 116 S.Ct. 1769.

 In a word, once the traffic stop is completed, the occupants of the vehicle must be allowed to leave "unless some-thing that occurred during the traffic stop generated the necessary reasonable suspi-cion to justify a further detention." *Unit-ed States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995). In *U.S. v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court stated:

> The reasonable-suspicion standard is a deviation of the probable-cause com-mand, *applicable only to those brief de-tentions which fall short of being full-scale searches and seizures and which are necessitated by law enforcement exi-gencies such as the need to stop ongoing crimes, to prevent imminent crimes, and to protect law enforcement officers in highly charged situations.*

*Id.* at 12, 109 S.Ct. 1581 (emphasis added).

In making determinations of reasonable suspicion and probable cause, "[a] trial judge views the facts of a particular case in light of the distinctive features and events of the community; likewise, a police officer views the facts through the lens of his police experience and expertise." *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996). In *Ornelas*, the Supreme Court recognized that:

> [D]eterminations of probable cause and reasonable suspicion involve a two-step process. First, a court must identify all of the relevant historical facts known to the officer at the time of the stop and search; and second, it must decide whether, under a standard of reason-ableness, those facts would give rise to a

reasonable suspicions justifying a stop or probable cause to search.

*Id.* at 699–700, 116 S.Ct. 1657.

As to the first factor of relevant historical facts, the Government did not offer any empirical support for the officers' conclusory statements about guns or drug trafficking on Tennessee's interstate highway or the troopers' references to Boston as a known destination for drug dealers. Trooper Pierce who caused Orsolini's extended detention had been with the highway patrol for three and a half years.

For the second factor, the Supreme Court explained that " 'reasonable suspicion' and 'probable cause' are 'common sense, nontechnical conceptions that deal with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' " *Id.* at 702, 116 S.Ct. 1657 (quoting *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328–2329, 76 L.Ed.2d 527 (1983)). In *United States v. Erwin,* 155 F.3d 818 (6th Cir.1998), the Sixth Circuit held that:

> [T]he warrantless search of the defendant's vehicle was not unconstitutional under the Fourth amendment because (1) the Constitution does not mandate that a driver, after being lawfully detained, must be released and sent on his way without further questioning once the law enforcement officer determines that the driver has not, in fact, engaged in the particular criminal conduct for which he was temporarily detained; ...

*Id.* at 820.

In *Erwin,* the defendant was detained by law enforcement officers after the officers ascertained that he was not driving while impaired. The Court stated that "[a]fter the deputies satisfied themselves that Erwin was not drunk or otherwise impaired, they were justified in continuing to detain Erwin if, by then, they had reasonable and articulable suspicion that Erwin was engaged in other criminal activity." *Id.* at 822. The Court reasoned:

> We think, as the district court did, that the deputies were reasonably entitled to conclude that Erwin may have been a drug dealer, based on the facts that he (1) was nervous, (2) seemed to try to avoid being questioned by attempting to leave, (3) seemed to have used or was preparing to use a pay phone to make a call when a cellular phone was available, (4) seemed to have drug paraphernalia in his vehicle, (5) had a large amount of cash, (6) had not registration or proof of insurance, (7) had a criminal record of drug violations, and (8) had an out of place backseat cushion.

*Id.*

■ Here, Orsolini asserts that his detention was unreasonable because the troopers lacked reasonable suspicion and without reasonable suspicion or probable cause, the search of his vehicle violated his Fourth Amendment rights.

Trooper Pierce's suspicion of Orsolini's involvement in criminal activity was based on the following: (1) the recent purchase of the vehicle with cash in a source city for drugs; (2) inconsistent stories about where and why Orsolini had been in Texas; (3) inconsistent stories from Orsolini and passenger about who they were going to see in Boston; (4) inconsistent stories as to the nature of the relationship between Orsolini and the passenger; (5) defendant became visibly nervous when he was asked for consent to search the vehicle; and (6) Orsolini's subsequent revocation of his consent. The Court finds that these occurrences did not create a reasonable basis for the officers' suspicion and ultimate detention of Orsolini.

As to the first factor, Orsolini's recent purchase of the vehicle with cash, the Court finds that this fact fails to establish a reasonable, articulable suspicion. The

recent cash-purchase of a vehicle does not yield to an assumption of criminal activity.

The second factor on which the government relies as a basis for Orsolini's detention is the inconsistent stories of Orsolini and passenger about where and why they had been in Texas and their personal relationship. In *Mesa*, the Sixth Circuit found differences between two witnesses' statements about personal matters was insufficient to establish reasonable suspicion. 62 F.3d at 162. Such a discrepancy "is simply not a discrepancy sufficient to generate suspicion in the mind of a reasonable police officer. A hunch is not reasonable suspicion." *Id.* In the Court's view, under *Mesa*, the inconsistencies about personal history that were based upon leading questions of the officer, fail to establish an articulable and reasonable suspicion of criminal activity.

In *United States v. Olson*, 59 F.Supp.2d 725 (M.D.Tenn.1999), the Honorable Thomas A. Higgins, held in similar circumstances that a state highway trooper lacked articulable suspicion to detain the defendant once the purpose of the initial traffic stop was complete. In *Olson*, the trooper based his suspicion that the defendants were involved in criminal activity on the following:

(1) that the stories the defendants gave Trooper Ferrell regarding the length of their trip to Arizona and whether the defendant's visited Mr. Olson's family were contradictory; (2) that [Trooper Ferrell] found it strange that the defendants flew to Arizona to purchase an unremarkable, 1991, Chevrolet Lumina; (3) that the defendants had their luggage in the back seat of the vehicle rather than in the trunk; (4) that [Trooper Ferrell] smelled what he thought to be green marijuana and that Mr. Bostwick was rapidly and nervously puffing on his cigar; and (5) the fact that Mr. Olson had an open title on the vehicle, that the title was dated October 8, 1998, rather than closer to the time of the stop, and that the license plate on the vehicle belonged to another car owned by Olson.

*Id.* at 730.

The Court concluded that the government had failed "to establish that Trooper Ferrell had a reasonable, articulable suspicion based on the allegedly contradictory statements of the defendants." *Id.* at 731. The Court reasoned that "the sequence of events indicates that Trooper Ferrell did not know of any inconsistency at the time the traffic stop was complete because he had not yet spoken to Mr. Bostwick. Accordingly, any statements Mr. Bostwick made which contradicted Mr. Olson's statements could not justify the detention of the defendants." *Id.* Additionally, as Judge Higgins noted "traveling with a number of bags in the back seat of a vehicle is not so uncommon as to give rise to a reasonable, articulable suspicion that the defendants were engaged in unlawful conduct." *Id.* The Court concludes, that the facts here as similar and likewise concludes that the cited inconsistencies do not establish reasonable suspicion.

Trooper Brinkley also testified that his suspicion was based upon Orsolini's nervous disposition when he was asked to consent to a search of the vehicle. The Sixth Circuit has stated that "we do not rule out the possibility that under some set of circumstances nervousness alone actually might give an officer sufficient reasonable suspicion to support a further detention that is certainly not the case under the facts presented here." *Mesa*, 62 F.3d at 163. Yet, the Sixth Circuit noted that "nervousness is generally included as one of several grounds for finding reasonable suspicion and not a ground sufficient in and of itself." *Id.* at 162. Here, the Court finds that the nervousness of Orsolini

alone and in conjunction with the other cited factors, cannot serve as a basis for a reasonable, articulable suspicion of criminal activity.

Lastly, the government cites Orsolini's revocation of consent to search his vehicle as as a basis for suspicion. This Court recognizes that Orsolini had a right to withdraw his consent at any time, and does not view his subsequent revocation as basis for a reasonable, articulable suspicion of criminal activity.

Here, the Court concludes that the facts here are substantially similar to those in *Olson*, and that the factors used in establishing a basis for a reasonable and articulable suspicion of criminal wrongdoing here do not rise to the level of the factors required by or found in *Erwin*. First, Orsolini did not avoid the questions of the troopers during the initial traffic stop and he did not appear to have drug paraphernalia in his vehicle during the course of the initial traffic stop. Trooper Pierce, who initiated the stop, concluded that Orsolini possessed a valid driver license during the traffic stop by telling Orsolini that he was free to go. The troopers did not discover that Orsolini had a criminal record of drug violations. The time to complete the necessary paperwork for the initial stop should have taken five to six minutes. Orsolini was held for almost an hour. This Court concludes that in light of the circumstances, the officers' suspicion was neither reasonable nor articulable.

In light of all of the factors articulated, the Court concludes here, as in *Olson*, that the "Trooper...had no articulable suspicion upon which to detain the defendant[ ] once the purpose of the initial traffic stop was complete." *Olson*, 59 F.Supp.2d at 732. The Court concludes that "the ensuing search of [the defendant's] vehicle violated the defendant['s] right[ ] to be free of unreasonable searches and seizures." *Id.*

■ Moreover, despite prior questioning of Orsolini, Trooper Pierce told him before the seizure of the vehicle that he was free to go. Yet, within seconds, Trooper Brinkley is telling Orsolini that the vehicle must remain at that site without any addition information. At that point, the decision to seize possession of the vehicle and, as a practical matter, to seize and detain the defendant was made. That is the point to evaluate the facts cited to warrant Orsolini's continued detention.

As to Orsolini being told that he was free to go, Trooper Brinkley stated, "Hey, you come here." After Orsolini revoked his consent to allow the troopers to search the vehicle, he was told that the vehicle would have to stay until a canine "sniff dog" arrived. Yet, the testimony was that the troopers gave Orsolini and his accomplice a ride because they deemed it illegal for citizens to walk on the expressway. The only other option was to walk in the wooded areas on foot. The latter seems a non-viable and unreasonable option for two out of state residents unfamiliar with the area. Orsolini and the passenger were then taken to the next exit by Trooper Ferguson in his patrol car. After the canine sweep, Orsolini and passenger were brought back to the site of the initial traffic stop by Trooper Ferguson.

The Court concludes that under these circumstances, that a reasonable person would not have believed that he was free to go and that Orsolini was detained. See *United States of America v. Dortch*, 199 F.3d 193, 196 (5th Cir.1999) wherein the Fifth Circuit held that actions of officers amounted to a detention when "[t]he officers told [the defendant] that he would be free to leave after the check for warrants was complete but that the officers would detain the car until they had performed a canine search of it". Thus, the Court con-

cludes that the detention of Orsolini constituted a seizure.

■ In contrast to reasonable suspicion to deter a person, the Fourth Amendment has been interpreted as permitting a law enforcement officer to "briefly detain a person for investigation if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot' even . if the officer lacks probable cause." *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581. Yet, the Sixth Circuit has stated that "unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Erwin,* 155 F.3d at 826 (quoting *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984)).

In a word, an extended detention of a suspect requires a showing of probable cause. In *Avery,* 128 F.3d at 979–80, the Sixth Circuit stated that:

> Although an officer may have reasonable suspicion to detain a person or his possessions for investigation, the officer's investigative detention can mature into an arrest or seizure if it occurs over an unreasonable period of time or under unreasonable circumstances. While the Supreme Court has refused to set an outer time limit on detentions, the Court has held that the *passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause.* Officers must diligently pursue a means of investigation to confirm or dispel their suspicions quickly.

*Id.* (citations omitted) (emphasis added).

Moreover, the Supreme Court found a highway checkpoint practice unreasonable where the "average stop for a vehicle not subject to further processing lasts two to three minutes or less." *Edmond,* 531 U.S. at 36, 121 S.Ct. at 451. Significantly here, Trooper Pierce detained Orsolini initially about ten minutes without any significant questioning and appears to have deliberately delayed issuing the citation to allow a more experienced trooper to question Orsolini. Orsolini was detained over 50 minutes after the speeding citation was issued. The citation was issued to Orsolini at 3:24 p.m. The canine "sniff dog" arrived at the scene at 4:02 p.m. Both parties have stipulated that the search after the arrival of the dog lasted an additional 17 minutes. The Court finds that Orsolini was detained for an unreasonable amount of time without probable cause.

The circumstances under which this seizure and search were conducted lead the Court to conclude that these troopers were using a checkpoint type of seizure in the context of a speeding violation.[4] The constitutional test is not the result of troopers' activities, but the facts giving rise to reasonable and individual suspicion of a crime. As the Supreme Court recently observed:

> We decline to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes. We cannot sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has commited some crime.

*Edmond,* 531 U.S. at 43, 121 S.Ct. at 455.

> Moreover, as the Sixth Circuit observed,
> Although there is always a temptation in cases of this nature when a substantial quantity of drugs and firearms are found to let the end justify the means, it

---

4. As the Honorable Thomas A. Higgins, District Judge, observed in *Olson* about the Tennessee Highway Patrol's "Criminal Interdic-tion Team [that] patrols the interstate for crimes involving guns, drugs, or stolen vehicles." *Olson,* 59 F.Supp.2d at 726.

must be remembered that the courts only see cases in which the conduct of the officer resulted in contraband being found. If the officers had found no drugs in the defendant's car, obviously we would not even know that this traffic stop had ever occurred. Therefore, we must accept that courts will always be "thwarting" what some may view as a good piece of police work when a motion to suppress is granted in cases of this nature. Notwithstanding the importance of drug interdiction, however, we are still charged with the responsibility of seeing that the interdiction occurs without the Constitution being violated.

*Mesa,* 62 F.3d at 163.

In summary, the Court finds that Troopers Pierce and Brinkley did not have a reasonable and articulable suspicion or probable cause upon which to detain Orsolini once the purpose of the initial traffic stop for speeding was complete. The ensuing search of Orsolini's vehicle violated Orsolini's right to be free of unreasonable searches and seizures under the Fourth Amendment. "Evidence seized as the result of an unconstitutional search is the fruit of the poisonous tree and can not be used against the victim of the search." *Olson,* 59 F.Supp.2d at 732. Accordingly, the Court concludes that the detention of this defendant was an unlawful seizure and the contraband discovered during the ensuing search shall be excluded. Thus, Orsolini's motion to suppress should be granted.

An appropriate Order is filed herewith.

### ORDER

In accordance with the accompanying Memorandum, the defendant Joshua Paul Orsolini's motion to suppress (Docket Entry No. 15) is **GRANTED** and the Government's motion to ascertain status (Docket Entry No. 34) is **DENIED** as moot.

It is so **ORDERED**.