**UNITED STATES of America, Plaintiff,**

v.

**Leo LETOURNEAU, Defendant.**

**Criminal Action No. 5:96–CR–95.**

United States District Court,
N.D. Ohio,
Eastern Division.

July 1, 1996.

George C. Pappas, Jr., Law Offices of George C. Pappas, Akron, OH, for Leo A. Letourneau.

Robert J. Becker, Office of U.S. Attorney, Akron, OH, for U.S.

## OPINION AND ORDER

O'MALLEY, District Judge.

Defendant, Leo Letourneau, moves to suppress evidence seized during a search of his person and vehicle on the day of his arrest. Letourneau also seeks to suppress statements made by him to law enforcement officials subsequent to his arrest. Because Letourneau concedes that he was given properly-phrased *Miranda* warnings prior to the inculpatory statements he now seeks to suppress, Letourneau's second request depends upon a resolution of the first.[1] Thus, the issue before the Court is whether the stop and search of Letourneau's vehicle were permissible under the Fourth Amendment. Because the Court concludes that they were, defendant's motion to suppress is DENIED.

### Background

On February 26, 1996, Letourneau was stopped by Illinois State Trooper Michael C. Hartman on Interstate 55/70. Letourneau was driving a 1996 Lincoln Continental with Nevada license plates. The Lincoln was registered to the Hertz Corporation in Reno, Nevada.

---

1. At the hearing on this matter, defendant's counsel was asked whether he objected to the timing or adequacy of the *Miranda* warnings given in this case, and whether he sought to suppress the single statement made to law enforcement officers at the scene prior to his arrest (Tr. at 3–4). He specifically stated that he did not. Defendant's counsel made it clear that the statements he sought to suppress were those made subsequent to defendant's arrest and that the *only* ground upon which he sought to suppress Letourneau's statements to the police is his claim that the vehicle search was impermissible: "[w]hat I am saying is, if the stop is regarded as being illegal and against the Fourth Amendment, then everything that occurred and every statement, regardless of consent and regardless of what the situation was, should be suppressed." (Tr. at 4).

### Trooper Hartman's Description of Events

Hartman testified that he first spotted the Lincoln in the early morning hours of February 26, 1996. Letourneau passed Hartman while Hartman was sitting in his own vehicle at milepost 8. Hartman testified that, at that point, the Lincoln appeared to be speeding. When he tried to pursue Letourneau and clock his speed, however, Letourneau exited the highway and headed to a nearby restaurant.

Hartman positioned himself at milepost 12 and waited for the Lincoln to return to the highway. When it did, Hartman pulled out behind the vehicle. Both were in the left-hand lane. Hartman claims that he was able to pace the Lincoln, by reference to his own speedometer, at approximately 71 miles per hour, 6 miles above the posted limit of 65. As he approached the vehicle from behind, moreover, the Lincoln suddenly pulled into the right hand lane, immediately behind another vehicle. Hartman stopped the Lincoln at that point.

Hartman approached the vehicle and had a discussion with Letourneau. Letourneau claimed that the speed limit signs had been covered and that he, therefore, did not know what the speed limit was. Because the traffic infractions were minor, Hartman decided to give Letourneau a written warning, rather than a ticket. Hartman showed Letourneau the written warning, had Letourneau sign it acknowledging speeding and safe-distance infractions, and told Letourneau he was free to leave. Hartman then asked Letourneau if he would consent to a search of his vehicle.

Hartman claims that he asked to search Letourneau's vehicle because the following facts made him suspicious: (1) Letourneau had a newly issued Las Vegas license (issued thirteen days prior to the stop), but had rented the Lincoln in Reno; (2) Letourneau had a valid Arizona license at the time he applied for and obtained a new license in Las Vegas; (3) Letourneau explained these facts by stating that he had just retired and moved from Arizona and that he rented the car in Reno because there "were no luxury cars" available for rental in Las Vegas; (4) Letourneau had luggage in the backseat, despite the size of the vehicle's trunk; and (5) Letourneau seemed "out of sorts" and nervous.

Letourneau consented to the search and was given a consent-to-search form, which he executed. At that point, Hartman conducted a search with the help of two other Troopers who had come on the scene. Seventeen satchels of marijuana (approximately 200 lbs.) were found in the trunk of the Lincoln. Cocaine was found in the glove compartment and, in a search incident to Letourneau's arrest, on his person.

Letourneau was read his rights, waived those rights orally and in writing, and described a marijuana conspiracy whose purpose was to distribute marijuana in the Northern District of Ohio. Letourneau traveled to Akron, Ohio with Trooper Hartman and others and cooperated in a controlled delivery of the marijuana.

Certain points were also made during Hartman's cross-examination by Letourneau's counsel: (1) Hartman had radar equipment available to him by which he could have measured Letourneau's speed, but did not use it, even though he was waiting in the median at milepost 12 for the precise purpose of watching for a speeding violation by the Lincoln; (2) Hartman signaled to dispatch that he was on a 106–4, identified as a search code, before obtaining Letourneau's consent to search; and (3) Hartman was assigned to a special drug interdiction task force.

### Letourneau's Description of Events

Letourneau also testified about the events leading up to his arrest on February 26, 1996. His version differs from that offered by Hartman in the following material respects.

Letourneau claims that he was not speeding when Hartman stopped him, nor was he aware of a vehicle traveling in front of him, in close proximity or otherwise. When Hartman did stop him, he was told he was being stopped for speeding earlier that morning, prior to exiting the highway. Letourneau stated that it wasn't until he read the written warning that he knew anything about being accused of following another vehicle at an

unsafe distance or of speeding after his reentry onto the interstate.

Letourneau claims that it was not long after his initial stop, and before he executed the consent-to-search, that additional troopers arrived on the scene. Letourneau testified that he never felt free to leave during the sequence of events, although Letourneau did not specifically deny that Hartman told him he was free to leave after he executed the warning.

Letourneau next claims that, while being transported to Ohio by Hartman and others, Hartman told him a number of things. Hartman allegedly told Letourneau that Hartman only saw Letourneau speeding before he exited the highway, not afterward. Letourneau also claims that Hartman bragged about the number of vehicle searches he has conducted and mentioned certain recognition he received because of the amount of drugs found during those highway searches.

Letourneau also made certain concessions during his testimony. While denying he was speeding, Letourneau admitted he did not know how fast he was going and had no idea what the speed limit was on the stretch of highway he was traveling. Indeed, Letourneau did not notice Hartman's cruiser sitting in the median strip when he passed him at mile post 12 and did not know Hartman had pulled out after him until Letourneau spotted Hartman directly behind him in the left hand lane. Letourneau also conceded that he knew what he was signing when he signed the consent-to-search form, a document which authorized an unlimited search of the Lincoln. And, Letourneau admitted to being nervous throughout his encounter with Hartman. Finally, Letourneau confirmed that he had been a police officer in Massachusetts for over seven (7) years.

### Analysis

■ The defendant was stopped, his vehicle was searched and he was arrested, all without a warrant. The Court must engage in a four step analysis to determine whether that course of conduct was constitutionally valid: (1) there must be articulable facts sufficient to support a reasonable suspicion on the part of the officers that the defendant was engaged in criminal activity at the time of the stop (*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); (2) the stop must not be overly intrusive in light of the surrounding facts and circumstances (*United States v. Garza*, 10 F.3d 1241 (6th Cir.1993)); (3) the search must be supported by probable cause or valid consent; and, finally, (4) the arrest must be supported by probable cause. If the stop and search were valid, defendant cannot and does not dispute that the drugs found in his vehicle would justify his warrantless arrest. Accordingly, the Court focuses its inquiry on steps 1–3.

■ As to step one, defendant does not seriously dispute that law enforcement officers may stop vehicles for observed traffic violations without running afoul of the Fourth Amendment. Defendant argues: (1) that Hartman did not observe a traffic violation (i.e., that Hartman's rendition of the facts prompting the stop should be discredited by this Court); and (2) even if a minor traffic violation had been observed, the stop was improper because no "reasonable officer would have stopped the defendant under the same circumstances absent the desire to conduct a mere investigation, or hunch that the individual is engaged in other illegal activity." (Defendant's Brief at 3–4). Defendant contends that an apparently valid stop can be challenged if a reasonable officer would not have made the stop in the circumstances, absent some other motivation.

This Court finds that Hartman did observe activity which justified the conclusion that a traffic violation was occurring, minor though it might have been. While the Court's conclusion on this point would be easier to reach if Hartman had used his radar, Hartman testified that he paced Letourneau's Lincoln on his calibrated speedometer and was, thus, able to obtain a fairly accurate measure of his speed—71 miles per hour. Letourneau, on the other hand, while allegedly sure he was not speeding, had no idea how fast he was going or even what the speed limit was. Indeed, Letourneau was unaware of Hartman's presence in the median when passing him—making it difficult for Letourneau to dispute what Hartman observed at that point

in time. This Court credits Hartman's testimony on this point and finds that Hartman had probable cause to conclude that a traffic violation was occurring at the time he stopped Letourneau.

 That the traffic violation was minor, that no citation was ever issued or that Hartman may have stopped Letourneau *precisely because* he suspected the stop would disclose other illegal activity are all irrelevant to the validity of the stop. It has been clear in this Circuit since 1993 that law enforcement officers may stop vehicles for traffic infractions, no matter how slight, "regardless of whether this was the only basis or merely one basis for the stop." *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (*en banc*) (if traffic stop is otherwise supportable, it is irrelevant what officer knew or suspected about the driver at the time of the stop). And, it has been clear in this Circuit that the validity of a traffic stop is to be measured by a traditional probable cause standard, rather than the heightened "reasonable officer" standard that defendant espouses. *See, e.g. United States v. Harvey*, 16 F.3d 109, 111 (6th Cir.1994). Indeed, one Sixth Circuit panel has noted that "[t]his Circuit's law in this area gives police agencies as much and arguably more authority than any other circuit." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995).

The United States Supreme Court has very recently endorsed this Circuit's approach to Fourth Amendment challenges to traffic stops and expressly rejected the "objective officer" test defendant urges upon this Court. In *Whren v. United States*, —— U.S. ——, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), the Supreme Court unanimously upheld a stop and temporary detention of a motorist by plainclothes drug interdiction officers who stopped a vehicle in a "high drug area" for failing to signal a right hand turn and moving away from the intersection at an "unreasonable rate of speed." The Supreme Court refused to question the officers' motives and found that issues of pretext and intent are irrelevant to the validity of a traffic stop. The Supreme Court held that, where probable cause that a traffic infraction has occurred exists, as this Court found existed here, a stop is valid under the Fourth Amendment, regardless of the trivial nature of the infraction or of the officer's subjective intent.

Based on this compelling authority and this Court's probable cause determination, defendant's objections to the stop are not well-founded.

As to step two of the Court's inquiry, defendant contends that, even if the initial stop were permissible, the scope of the detention after the stop was not. Letourneau claims that Hartman exceeded the bounds of his authority when he questioned Letourneau about his license and vehicle rental, asked about the presence of drugs or guns and asked for consent to search the vehicle.

 Defendant is correct that, "once the purposes of the initial traffic stop were completed, the trooper could not further detain the vehicle or its occupant unless something that occurred during the stop generated the necessary reasonable suspicion to justify further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995). Letourneau argues that nothing justified the scope of the detention to which he was subjected.

The government argues that Hartman's handling of the stop was permissible and did not exceed reasonable bounds. The government is correct for two reasons. First, the mere asking of questions during a traffic stop, even if those questions are not narrowly related to the traffic violation, is not necessarily overly intrusive. Second, Letourneau's responses to Hartman's legitimate inquiries were sufficiently questionable to justify Hartman's suspicion that Letourneau was hiding something, and to thereby justify further detention and inquiry.

 Defendant contends that it is improper for an officer to engage in dialogue with someone stopped for a traffic offense; that it was improper for Hartman to ask Letourneau about his travel plans, his dual driver's licenses, the vehicle rental or the presence of contraband in the car. Letourneau, however, cites no authority for the proposition that, absent some additional element of coercion, an officer can overstep the bounds of the Fourth Amendment by mere inquiry, and

this Court is disinclined to place such unreasonable constraints on the conduct of a traffic stop. There is no claim that the officer placed Letourneau in an uncomfortable position during this inquiry or made any undue show of authority—Letourneau was allowed to remain in his own vehicle at all times, Hartman never drew his weapon or threatened Letourneau with reprisals for any failure to respond to his inquiries, Hartman spoke to Letourneau from the passenger window, and he was unaided by additional officers during this dialogue. The questioning occurred during the course of the vehicle stop and did not unduly delay that portion of the stop.[2] Letourneau was free to answer or refuse to answer Hartman's questions in any fashion he chose. Under these circumstances, an officer's questions, even wholly unfounded ones, do not run afoul of the Fourth Amendment.

■ Even if questions regarding contraband would be impermissible in these circumstances, moreover, other factors justified continued inquiry in this case. Hartman claims that Letourneau's responses to his legitimate inquiries made him suspicious, thereby prompting additional questions and, ultimately, a request that Letourneau consent to a search of his vehicle. Specifically, Hartman claims: that Letourneau appeared nervous and out of sorts; that the fact that Letourneau had valid driver's licenses from two different states, including one obtained only thirteen days previously, was suspicious; that Letourneau's claim that luxury cars could not be obtained in Las Vegas was not viable; and that the presence of luggage in the backseat did not seem logical, given the size of the vehicle's trunk and the travels described. The government contends that these factors create sufficient articulable suspicion to justify a continued stop and to ask about the presence of contraband, even to the point of asking for a consent to search.

Factors like these have been deemed sufficient to justify continued detention in other circumstances and this Court concludes they are sufficient for that purpose here as well. See, e.g., United States v. Soto, 988 F.2d 1548, 1555 (10th Cir.1993), and cases cited therein. While recent cases in this Circuit have been cautious about justifying continued questioning based on alleged missteps in responses to earlier inquiries (E.g., United States v. Mesa, supra: United States v. Garnier, unpublished, 28 F.3d 1214, 1994 WL 362085 (6th Cir.1994)), those cases are distinguishable from the circumstances at issue here and in Soto. The questioning here occurred in a non-hostile, non-coercive atmosphere. Letourneau was never taken out of his vehicle or placed in a police cruiser, no weapons were ever drawn, no hostile or threatening language was ever used and no statements that could be characterized as misleading or deceitful were ever made by the officer.

The factors which raised concern for Hartman likely would have raised concern for any reasonable officer. A newly acquired license in the face of an already valid one from another state, rental of a vehicle in a city distant from both defendant's listed residence and from where he obtained that new license, less than logical explanations for these facts, and nervousness about them, when combined raised reasonable articulable suspicion to justify further inquiry, even to the point of requesting consent from Letourneau to search his vehicle.

■ Given these conclusions, the only question which remains (step three of the Court's inquiry), is whether the consent-to-search obtained from Letourneau was valid. Clearly it was. The government has the burden of proving consent. United States v. French, 974 F.2d 687, 693 (6th Cir.1992). Voluntariness of consent in a given case must be determined from the totality of the circumstances. Florida v. Royer, 460 U.S. 491, 516, 103 S.Ct. 1319, 1334, 75 L.Ed.2d 229 (1983). Here, Hartman gave Letourneau a consent-to-search form and asked him to read and sign it. At the time, Letourneau

---

2. This factual conclusion is important. There is authority for the proposition that questioning which unduly prolongs a detention is impermissible in the absence of reasonable suspicion to support the need for additional inquiry. Here, neither the questioning to which defendant objects nor the detention was prolonged. Dialogue alone is not constitutionally impermissible in the brief, non-coercive encounter at issue here.

sat behind the steering wheel of his own vehicle and was neither restrained nor detained. He had already executed the warning which signaled the completion of his traffic stop, had his license and rental papers returned to him and had been expressly told he was free to leave.[3] Hartman gave him the form while standing on the passenger side of the vehicle, without drawing a weapon or making any show of force. Although other officers arrived on the scene at about the same time, they remained at their own vehicle and did not participate in making the request to Letourneau. Finally, Letourneau admits that he knew what he was signing when he executed the consent-to-search which, on its face, authorizes a full search of the vehicle and its compartments.

 All of these facts must be considered in light of the fact that Letourneau is not only a man of more than average intelligence, he was a police officer for seven (7) years. Surely, Letourneau understood the limitations placed on Hartman's ability to demand to search his vehicle, Letourneau's right to refuse to allow the search, and the meaning and effect of the consent he knowingly executed.

In these circumstances, Letourneau's unequivocal consent was knowing and voluntary, thereby making the search permissible under the Fourth Amendment. That later circumstances may have prompted Letourneau to regret his decision to allow a search and to, thereafter, actively cooperate with the government, does not alter the validity of the search premised on that earlier, voluntary choice.

### Conclusion

For all these reasons, the Court finds that the vehicle stop was legitimate, the conduct of that stop and detention were not overly or impermissibly intrusive, Letourneau's consent to search his vehicle was knowing and voluntary, the subsequent search was valid and Letourneau's warrantless arrest was jus-

tifiable. The defendant's motion to suppress is, thus, DENIED.

Trial of this matter will occur on July 29, 1996.

**IT IS SO ORDERED.**

---

**3.** Although Letourneau claims he did not "feel" free to leave, he did not deny he was told he could do so and there is no dispute that he had possession of the documents needed to properly and legally operate his vehicle. "At that point, the encounter between the driver and the officer became an ordinary consensual encounter between private citizen and a law enforcement officer." *United States v. Werking,* 915 F.2d 1404, 1408 (10th Cir.1990).