CITY OF GARFIELD HEIGHTS, Appellee,

v.

SKERL, Appellant.

CLEVELAND METROPOLITAN PARK DISTRICT, Appellee,

v.

SKERL, Appellant.

[Cite as *Garfield Hts. v. Skerl* (1999), 135 Ohio App.3d 586.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

Nos. 74545 and 74555.

Decided Nov. 15, 1999.

588

*Joseph E. Feighan, Jr.,* for appellees.

*Brooks J. Chapin; John J. Duffy & Assoc.* and *William J. Kerner,* for appellants.

---

PATTON, Judge.

Defendant-appellants, Paul and Stephen Skerl, appeal the decisions of the trial court (1) denying their motions to suppress evidence seized from their car during a traffic stop, (2) entering a finding of guilt of firing a bow and arrow and possession of alcohol, (3) entering a finding of guilt of possession of marijuana and drug paraphernalia, and (4) entering a finding of guilt of improper display of front license plates.

At 1:00 p.m. on February 17, 1998, Metropark Ranger John Weseloh observed a 1989 Oldsmobile without a front license plate enter the Garfield Park Reservation parking lot. Weseloh activated his lights and siren and approached the vehicle from behind on the driver's side. While walking along the side of the car,

Weseloh looked through the rear window and noticed a partially concealed red bow with five blunt-tipped arrows on the back seat.

Weseloh arrived at the driver's side window and asked the driver, Paul Skerl, and his passenger, Stephen Skerl, "if they had any other weapons, drugs or sharp objects on their persons." Both Skerls responded that they were in possession of marijuana. Immediately, Weseloh asked Paul Skerl to get out of the vehicle and Weseloh initiated a pat-down search. Weseloh found rolling papers in Skerl's right front pocket and a plastic bag containing marijuana in Skerl's left front pocket. Next, Weseloh handcuffed Paul Skerl and placed him in the police car. Weseloh then initiated a pat-down search of Stephen Skerl and discovered a pipe in his right front pocket and a plastic bag of marijuana in his left front pants pocket. After handcuffing Stephen Skerl and placing him in the police car, Weseloh searched the interior of the car and found a full unopened bottle of beer under the front passenger's seat. Weseloh also took possession of the bow-and-arrow set.

Stephen Skerl was charged with possession of under one hundred grams of marijuana and possession of drug paraphernalia. Paul Skerl was charged with possession of under one hundred grams of marijuana, possession of drug para- phernalia, and improper display of front license plates. He was also charged under Cleveland Metroparks Ordinances for possession of alcohol and propelling or shooting missiles. At their arraignment, both Skerls pleaded not guilty to all the charges. Each Skerl then filed a motion to suppress, arguing there was no lawful search, the pat-down searches did not meet any of the recognized exceptions to warrantless searches, and their statements were obtained in violation of their right against self-incrimination.

At a suppression hearing, Weseloh testified that he stopped the car because he did not observe a front license plate. He said that he asked the Skerls whether they had any drugs or weapons based on his observation of the bow and arrows in the back seat. Weseloh stated that he felt he had probable cause to arrest the Skerls after he found the drug paraphernalia and marijuana. After finding the marijuana, Weseloh said that he continued to search as a safety precaution in case the Skerls had any other weapons. On cross-examination, Weseloh testified that he never saw either of the Skerls throw, shoot, or propel the arrows.

Paul Skerl testified that he was on his lunch break and was showing his brother the Metroparks. Skerl said that he was looking for a park where he and his son could shoot off model rockets. He stated that he pulled into a parking lot and immediately saw the ranger pull up behind him. Skerl testified that the ranger was very rude and said, "Put your hands on the dash and don't move." Skerl said that the ranger asked them, "Do you have any other weapons or drugs in your car? You better tell me right now, because otherwise I will take you in

for fraud." At this point, Skerl said that he and his brother admitted to possession of marijuana. Skerl stated that the ranger asked him to get out of the car and then he began a pat-down search. Skerl also testified that the ranger threatened them with additional criminal charges if they "did not answer him right here." Skerl then admitted his license plate was not on the front of the car but instead was displayed in the front windshield. Last, Skerl said that he purchased the bow-and-arrow set as a present for his thirteen-year-old son.

At the conclusion of the suppression hearing, the trial court overruled both motions to suppress. A trial was set for April 20, 1998, and on that day both Skerls pleaded no contest to all the charges. The court found them guilty of all charges. A month later, the Skerls filed their separate notice of appeals. We consolidated the appeals. The Skerls present three assignments of error.

In their first assignment of error, the Skerls state as follows:

"The trial court erred in failing to grant appellants' motions to suppress."

First, the Skerls ("defendants") argue that the bow and arrows did not give rise to a reasonable suspicion of criminal activity; thus, Ranger Weseloh was precluded from asking defendants questions about any drugs, weapons, or drug paraphernalia in the car. As a result, defendants argue that the trial court should have granted their motion to suppress regarding the subsequent discovery of the marijuana, paraphernalia, and bottle of beer. In support, defendants cite *State v. Anderson* (1995), 100 Ohio App.3d 688, 654 N.E.2d 1034, where the court held that absent any articulable facts giving rise to a reasonable suspicion, an officer may not, incident to issuing a traffic citation, ask the motorist whether he has any drugs, weapons, or drug paraphernalia in the car.

Initially, we note that in a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses. *State v. Robinson* (1994), 98 Ohio App.3d 560, 649 N.E.2d 18; *State v. Rossiter* (1993), 88 Ohio App.3d 162, 623 N.E.2d 645. Thus, the credibility of witnesses during a hearing on a motion to suppress evidence is a matter for the trial court. A reviewing court should not disturb the trial court's findings on the issue of credibility. *State v. Mills* (1992), 62 Ohio St.3d 357, 582 N.E.2d 972. While we are bound to accept any findings of fact by the trial court that are supported by competent, credible evidence, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether the findings of fact meet the appropriate legal standard. See *State v. Harris* (1994), 98 Ohio App.3d 543, 649 N.E.2d 7.

Defendants do not contest the legality of the initial stop; therefore, we focus our discussion on events occurring after the stop. The first question is

whether Ranger Weseloh was justified in asking defendants whether they had any drugs or weapons in the car. We believe that *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762, is dispositive of this issue. In *Robinette*, citing *Florida v. Royer* (1983), 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229, the court stated that "the minimal intrusion of simple questioning of a person not in custody does *not* constitute a 'seizure' requiring Fourth Amendment protection." The *Royer* court continued:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions." *Id.* at 497, 103 S.Ct. at 1324, 75 L.Ed.2d at 236.

In the present case, Weseloh approached defendants and asked them if they had any drugs or weapons in the car. According to *Robinette*, this question was justified as simple questioning and did not amount to an intrusion sufficient to activate the protections of the Fourth Amendment. As to the applicability of *State v. Anderson*, 100 Ohio App.3d 688, 654 N.E.2d 1034, we find it to be unpersuasive in light of the subsequent holding in *Robinette*.

Second, defendants complain that there is no evidence sufficient to justify a *Terry* frisk. They argue that mere possession of the bow and arrows did not justify a frisk. They maintain that the bow and arrows were in the back seat of the car, and that they made no furtive movements toward the bow and arrows. Plus, they were not in a high crime area, but rather in a park parking lot at 1:00 p.m. on a lunch break. In addition, defendants claim that the fact that they informed Weseloh they were in possession of marijuana is also insufficient to justify a *Terry* frisk because Weseloh testified that he would have searched them even if they did not admit to possession of marijuana.

In *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the United States Supreme Court held that a search of a person for weapons is permissible when a police officer has a reasonable suspicion that criminal activity is afoot or that his safety, or the safety of others, is in danger. Reasonable suspicion requires more than a hunch by the officer; rather, specific and articulable facts and circumstances must be present to authorize the intrusion of a stop and frisk. The reasonableness of the officer's action is judged by an objective standard: whether a reasonable, prudent person in those circumstances would believe that his safety, or that of others, was threatened. In judging the reasonableness of a search, a court should look at the "totality of the circumstances." *State v. Smith* (1978), 56 Ohio St.2d 405, 409, 10 O.O.3d 515, 517, 384 N.E.2d 280, 282.

■ Weseloh asked defendants whether they had any drugs or weapons in the car. Defendants responded that they were in possession of marijuana. Based on defendants' response, Weseloh had reasonable suspicion, under *Terry*, that criminal activity was afoot. Therefore, a pat-down search or frisk of defendants was permissible.

■ Next, we must determine whether Weseloh exceeded the scope of a *Terry* frisk when he patted down defendants and discovered marijuana and drug paraphernalia on their persons. In conducting a *Terry* pat-down search, an officer may remove an object he reasonably believes is a weapon. *State v. Evans* (1993), 67 Ohio St.3d 405, 618 N.E.2d 162. More recently in *Minnesota v. Dickerson* (1993), 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334, the United States Supreme Court expanded the scope of the *Terry* pat-down to allow a search for contraband if the officer "feels an object whose contour or mass makes its identity immediately apparent." *Id.* at 375, 113 S.Ct. at 2137, 124 L.Ed.2d at 346. The court analogized the sense of touch to seizures allowed by the plain-view doctrine, reasoning that "[r]egardless of whether the officer detects the contraband by sight or by touch, however, the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures." (Footnote omitted.) *Id.* at 376, 113 S.Ct. at 2137, 124 L.Ed.2d at 346.

In *State v. Zachery* (1996), 114 Ohio App.3d 725, 684 N.E.2d 94, a case with a similar fact pattern, Zachery was a passenger in a car that was detained by police officers because the passengers allegedly created a disturbance and were in possession of guns. After the car was stopped, the passengers were asked to get out of the car and upon doing so, a shotgun was discovered in the car. Zachery was then subjected to a pat-down search. A weapon was not found on Zachery's person but the searching officer heard a plastic crinkle and felt "small pebble like objects." The officer, based on her past experience, retrieved what she was feeling for and it turned out to be a plastic bag containing crack. Zachery moved to suppress the evidence but the motion was overruled. Upon being convicted of drug abuse, Zachery appealed her conviction and argued that the pat-down search was illegal because the officer was searching for a weapon and the baggie she felt was certainly not a weapon so any further search was impermissively intrusive. The court rejected Zachery's argument, holding:

"From our review of the record, there is sufficient evidence in the record to justify the trial court's conclusion that police officer Goodwill had a sufficient basis for a weapons frisk, pat-down search, and that the weapons frisk, in turn, led to a reasonable conclusion that the object Goodwill was feeling was a plastic baggie containing crack cocaine." *Id.*, 114 Ohio App.3d at 728, 684 N.E.2d at 96.

■ Applying *Zachery* and the above-mentioned principles to the facts of the instant case, we find that Weseloh did not violate the protections of the Fourth Amendment and conduct an illegal search. Defendants admitted to Weseloh that they were in possession of marijuana. Weseloh asked each defendant to individually get out of the car. After each defendant left the car Weseloh initiated a pat-down search of each defendant. At the suppression hearing, Weseloh testified on direct examination and cross-examination that he had searched the defendants for weapons to guarantee his own safety and for drugs that defendants admitted to possessing. Therefore, during the pat-down search Weseloh was feeling for objects that felt like drugs or weapons. As he conducted the pat-down searches, Weseloh discovered rolling papers in Paul Skerl's right front pocket and a plastic bag containing marijuana in his left front pocket. While searching Stephen Skerl, Weseloh discovered in his right front pocket a pipe with what later turned out to be marijuana residue, and in his left front pocket a plastic bag containing marijuana.

An ancillary argument defendants present is that Weseloh only searched them based on his belief that the bow and arrow set in the back seat was a weapon. In support of this argument defendants cite the transcript of the suppression hearing where Weseloh stated on cross-examination that he would have searched defendants even if they had not admitted to possession of the marijuana. Defendants maintain that the bow and arrow set was not an illegal weapon, but was a legal item purchased by Paul Skerl at K–Mart for $29 as a present for his son. Thus, Weseloh basing his pat-down search on his observation of the bow and arrow set as a weapon and the possibility of defendants being armed and dangerous is clearly outside the parameters of a *Terry* pat-down because the bow-and-arrow set could not possibly be construed as a weapon.

■ Weseloh stated during the suppression hearing that he thought the bow and arrow set was a weapon. However, he said that he initiated the pat-down searches based on defendants' admissions that they possessed marijuana and out of concern for his own safety. The fact that Weseloh stated that he would have searched defendants regardless of their admissions creates a hypothetical scenario that this court need not address. In any event, a police officer's subjective motivations are irrelevant. *Whren v. United States* (1996), 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89; *Dayton v. Erickson* (1996), 76 Ohio St.3d 3, 665 N.E.2d 1091.

Weseloh conducted the pat-down searches for drugs as a result of defendants' admissions and in order to guarantee his own safety. Based on the holding and analysis in *Dickerson,* we hold that the pat-down searches did not violate the Fourth Amendment protection against illegal search and seizures. Accordingly, defendants' first assignment of error is overruled.

Defendants' second assignment of error states as follows:

"The trial court erred in entering a finding of guilty to appellant Paul Skerl's plea of no contest to the misdemeanor charges of firing the bow and arrow in the Metropark and of alcohol violations."

Defendant Paul Skerl ("Skerl") argues that the trial court's guilty verdict on his plea of no contest to a violation of Cleveland Metroparks Ordinance 549.02, prohibiting the throwing or shooting of missiles, was erroneously entered by the trial court. Skerl claims that there is no evidence in the record that substantiates the fact that he threw, shot, or propelled any of the arrows found in the back seat of his car. He maintains that there is nothing in the ordinance about simply possessing a bow and arrow set and therefore the trial court erred in entering a finding of guilt.

The state counterargues that a plea of no contest in a case precludes a defendant from challenging the factual merits of the underlying charge.

Crim. R. 11(B)(2) prescribes that "[w]ith reference to the offense or offenses to which the plea is entered," the "plea of no contest is not an admission of defendant's guilt, but is an admission of the truth of the facts alleged in the indictment." " 'Thus, there being no admission of guilt by a no contest plea and such plea only admitting the truth of the facts alleged in the indictment, if those facts do not, in and of themselves, constitute the allegation of an offense under the statute, or statutes, involved, the defendant has admitted to nothing upon which the court can base a conviction. A conviction without trial, based merely on a no contest plea to an indictment which does not allege facts sufficient to constitute an offense is not only a nullity but completely void.' " *State v. Luna* (1994), 96 Ohio App.3d 207, 209, 644 N.E.2d 1056, 1057, quoting *State v. Hayes* (Jan. 14, 1983), Hancock App. No. 5–82–11, unreported, 1983 WL 7178.

■ An indictment must contain words that are "sufficient to give the accused notice of all the elements of the offense with which the defendant is charged." Crim.R. 7(B). Furthermore, the indictment must contain "the essential facts constituting the offense for which an accused will be tried." *State v. Coburn* (1992), 84 Ohio App.3d 170, 172, 616 N.E.2d 567, 568 (citing Section 10, Article I of the Ohio Constitution).

■ The complaint charging Skerl stated the offense as "possession or throwing or shooting missile, to wit bow & arrows." It then listed "549.02" as the ordinance Skerl allegedly violated.

Cleveland Metroparks Ordinances 549.02 codifies the offense of illegally throwing or shooting missiles and states:

"No person shall throw, shoot, propel, release possession of an arrow, missile, pellet, stone, metal, paint ball, or other similar substance capable of causing physical harm to persons or property except at authorized ranges."

At the suppression hearing, Weseloh testified on cross-examination that he never saw defendants throw, shoot, or propel the arrows. Weseloh maintained that it was his interpretation of the ordinance that mere possession of the arrows was illegal. A review of the indictment and Weseloh's suppression testimony indicates that the complaint does not contain facts constituting an offense, under the ordinance, for which defendant could be tried. The first word of the complaint refers only to "possession" and under the ordinance mere possession is not illegal. Moreover, Weseloh stated that he never saw Skerl shoot, throw, or propel an arrow.

We find that the trial court erred by accepting Skerl's no contest plea. The ordinance does not prohibit mere possession of a bow and arrow set; it only prohibits the use of a bow and arrow set.

■ Similarly, Skerl applies the same argument presented above to the no contest plea he entered to possession of an alcoholic beverage, *i.e.*, bottle of beer. The complaint states that Skerl was charged with "consumption. Possession of an alcoholic beverage to wit: Budweiser beer." The complaint then states that this is a violation of Cleveland Metroparks Ordinances 529.01.

Cleveland Metroparks Ordinances 529.01, consumption, sale or possession, reads as follows:

"(a) As used in this section, 'alcohol' and 'intoxicating liquor' have the same meanings as used in Ohio R.C. 4301.01.

"(b) No person shall drink, sell, possess or offer for sale any intoxicating liquor or alcoholic beverage, except where received from, or offered by, an authorized holder of a liquor permit issued by the Ohio Department of Liquor Control or authorized by permit. (ORC 4301.62)."

This ordinance prohibits persons from drinking, selling, possessing, or offering for sale liquor not received from an authorized holder of a liquor permit. The ordinance then makes a reference to R.C. 4301.62, which is the state statute prohibiting a person from having an open container of liquor in a public place.

During Weseloh's search of Skerl's car, he found an unopened bottle of Budweiser beer under the driver's seat. Budweiser beer is commercially produced at Budweiser breweries and is sold only by authorized holders of liquor permits. Therefore, we can assume that Skerl received the bottle of Budweiser beer from an authorized holder of a liquor permit.

Reading the ordinance and state statute *in pari materia,* we find that they do not prohibit the conduct exhibited by Skerl. There is no language in either the ordinance or the statute that prohibits a person from possessing a legally purchased, unopened bottle of Budweiser beer.

The complaint charged Skerl with consumption and possession of a Budweiser beer. We find that the complaint does not contain facts constituting an offense, under the ordinance, for which Skerl could be tried. The ordinance does not prohibit possessing a bottle of beer and Skerl was not consuming any beer, so Skerl could not be tried for the offense charged in the complaint.

Based on the above analysis, we sustain Skerl's second assignment of error. Consequently, we vacate Paul Skerl's convictions for shooting, throwing, or propelling a missile and for possession or consumption of alcohol.

Skerl's third assignment of error states as follows:

"The trial court erred in ordering seizure and forfeiture of the bow and arrow set, since this set was legally possessed by the appellant."

Skerl states that the bow and arrow set seized from the back seat of his car was purchased at K–Mart for $29 and was a present for his son. He claims that the set was legally obtained and was not used in the commission of any crime. Skerl maintains that he made a motion at the suppression hearing to have the set returned to him, and that the motion was improperly denied by the trial court. Because the bow and arrow set was not involved in the commission of any crime, Skerl argues that the order of forfeiture should be revoked and the set should be returned to him.

In a forfeiture proceeding, the state bears the burden of proving that the seized property is contraband by a preponderance of the evidence. R.C. 2933.43(C); *State v. Roberts* (1995), 102 Ohio App.3d 514, 657 N.E.2d 547. Specifically, R.C. 2901.01(A)(13), (a) and (b) defines "contraband" as:

"(a) Property that in and of itself is unlawful for a person to acquire or possess;

"(b) Property that is not in and of itself unlawful for a person to acquire or possess, but that has been determined by a court of this state, in accordance with law, to be contraband because of its use in an unlawful activity or manner, of its nature, or of the circumstances of the person who acquires or possesses it."

The law does not favor forfeiture. *State v. Hill* (1994), 70 Ohio St.3d 25, 31, 635 N.E.2d 1248, 1253–1254. Therefore, statutes imposing forfeiture should be strictly construed, and whenever possible, forfeiture should be avoided. *Id.* at 26, 635 N.E.2d at 1250. To prove that the bow and arrow set is contraband and therefore subject to forfeiture, "the state must demonstrate that it is more

probable than not, from all the circumstances, that the defendant used the [bow and arrow set] in the commission of criminal offenses." *State v. Golston* (1990), 66 Ohio App.3d 423, 432, 584 N.E.2d 1336, 1342.

■ There is no evidence showing Skerl used the bow and arrow set in the commission of any criminal offenses. In addition, the bow and arrow set does not satisfy the elements of contraband, as defined in R.C. 2901.01(A)(13). Thus, we find that the trial court should have returned Skerl's bow and arrow set. As a result, we sustain Skerl's third assignment of error and order the trial court to return his bow and arrow set to him.

The judgment is affirmed as to defendants' convictions for possession of drugs and drug paraphernalia, vacated as to Paul Skerl's convictions for shooting, throwing, or propelling a missile and possession or alcohol consumption, and reversed as to the forfeiture of Paul Skerl's bow-and-arrow set.

*Judgment accordingly.*

PORTER, A.J., concurs.

KARPINSKI, J., concurs separately.

KARPINSKI, Judge, concurring.

I respectfully concur for the reasons that follow.

Ranger Weseloh legitimately stopped the Skerls' car for a suspected license plate violation. In *Berkemer v. McCarty* (1984), 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317, the United States Supreme Court analogized a routine traffic stop to a *Terry* stop:

"Under the Fourth Amendment, we have held, a policeman who lacks probable cause but whose 'observations lead him reasonably to suspect' that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to 'investigate the circumstances that provoke suspicion.' *United States v. Brignoni–Ponce* [1975], 422 U.S. 873, 881 [95 S.Ct. 2574, 2580, 45 L.Ed.2d 607, 617]. '[T]he stop and inquiry must be "reasonably related in scope to the justification for their initiation." ' *Ibid.* (quoting *Terry v. Ohio* [ (1968), 392 U.S. 1] at 29 [88 S.Ct. at 1884, 20 L.Ed.2d at 910].) Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." (Footnotes omitted.) *Berkemer v. McCarty,* 468 U.S. at 439–440, 104 S.Ct. at 3150, 82 L.Ed.2d at 334.

The court has also said that "reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop" and that "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer* (1983), 460 U.S. 491, 498, 500, 103 S.Ct. 1319, 1324, 1325, 75 L.Ed.2d 229, 237, 238.

In this case, Ranger Weseloh's traffic stop of the Skerls' car was clearly a "seizure" within the meaning of the Fourth Amendment.[1] Under the Fourth Amendment, Ranger Weseloh could briefly detain the driver, see *Pennsylvania v. Mimms* (1977), 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331, and the passenger, see *Maryland v. Wilson* (1997), 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41, to further investigate the suspected license violation. Ranger Weseloh observed a bow and arrow set in the car's back seat and immediately asked the Skerls whether they had any other weapons, sharp objects, or drugs on them or in the car. It does not appear that Ranger Weseloh made any further inquiry concerning the vehicle's license plate or registration, despite the fact that it was the suspected license violation that precipitated this traffic stop.

The spate of recent Ohio cases in which an officer making an otherwise routine traffic stop asks whether the vehicle's occupants were in possession of any weapons or drugs suggests that Ranger Weseloh's conduct here was no aberration. See, *e.g.*, *State v. Robinette* (1997), 80 Ohio St.3d 234, 685 N.E.2d 762; *State v. Riddle* (1995), 104 Ohio App.3d 679, 662 N.E.2d 1139; *State v. Anderson* (1995), 100 Ohio App.3d 688, 654 N.E.2d 1034; *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498.

It may be that nothing prohibited Ranger Weseloh from asking the Skerls whether they were in possession of drugs. "[T]he mere asking of questions during a traffic stop, even if those questions are not narrowly related to the traffic violation, is not necessarily overly intrusive." *United States v. Letourneau* (N.D.Ohio 1996), 944 F.Supp. 619, 623. It may also be, however, that nothing required the Skerls to answer that question. See *Berkemer v. McCarty, supra*.

But the Skerls did answer Ranger Weseloh's question, and their refreshingly candid admission to marijuana possession furnished Ranger Weseloh with sufficient grounds to investigate. And because Ranger Weseloh made his inquiry

---

1. If the majority means to suggest that Ranger Weseloh's encounter with the Skerls was equivalent to mere questioning on a public street such that the Fourth Amendment did not apply, I cannot agree. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States* (1996), 517 U.S. 806, 809–810, 116 S.Ct. 1769, 1772, 135 L.Ed.2d 89, 95. Ranger Weseloh's traffic stop clearly was a Fourth Amendment "seizure," and his subsequent conduct was likewise subject to that amendment's constraints.

before he had completed his investigation of the suspected license violation, this is not a case in which the original justification for stopping and detaining the suspect had concluded before the law enforcement officer went fishing for additional grounds to detain the suspect. It is for that reason that I would distinguish this case from cases such as *State v. Robinette*, *State v. Riddle*, *State v. Anderson*, and *State v. Retherford*, *supra*. I accordingly concur that Ranger Weseloh did not violate the Skerls' Fourth Amendment rights.

I also agree that Paul Skerl's conviction for violating Metroparks Ordinance 529.01 cannot stand. I am mystified as to exactly what this ordinance proscribes.[2] It cannot reasonably be understood to criminalize the mere possession of an unopened alcoholic beverage in the Metropark. In his "possession" of this alcoholic beverage, Paul Skerl was no different from any other motorist who drives home from the grocery store through the Metropark. There is no indication that Paul Skerl was going to consume the beer at the time of the traffic stop.

If, however, the ordinance is intended to criminalize the mere possession of an unopened alcoholic beverage, the ordinance expressly excepts the alcoholic beverage "received from, or offered by, an authorized holder of a liquor permit issued by the Ohio Department of Liquor Control or authorized by permit." The prosecutor gives us no reason to think that this exception did not apply; that is, nothing in the record indicates that this alcoholic beverage was received from or offered by anyone other than an authorized holder of a liquor permit issued by the Ohio Department of Liquor Control or authorized by permit.

On its face, the exception seems to transform the ordinance into a prohibition of moonshine. If, however, the phrase "except where" is understood to refer to location, then the ordinance would criminalize possessing an alcoholic beverage lawfully received anywhere else except on the Metropark premises. But such a distinction based merely on the geographical origin of a can of beer might run afoul of the Commerce Clause.

If, on the other hand, the ordinance applies only to open containers, as the ordinance's reference to R.C. 4301.62 might indicate, then the ordinance does not apply whatsoever since no one disputes that the container in Skerl's car was unopened. In any case, I fail to see how these facts stated a criminal offense under Cleveland Metroparks Ordinances 529.01. See R.C. 2901.04(A); *Vermilion v. Stevenson* (1982), 7 Ohio App.3d 170, 7 OBR 215, 454 N.E.2d 965.

---

2. Section 529.01(b) provides:

   "No person shall drink, sell, possess or offer for sale any intoxicating liquor or alcoholic beverage, except where received from, or offered by, an authorized holder of a liquor permit issued by the Ohio Department of Liquor Control or authorized by permit. (ORC 4301.62)."

I am also in full agreement with the majority that Paul Skerl's conviction for violating Cleveland Metroparks Ordinances 549.02 cannot stand and that the forfeiture of the bow and arrow set should be set aside.